## BEALMEAR *v*. STATE.

### Opinion delivered July 15, 1912.

1. HOMICIDE—SELF-DEFENSE—INSTRUCTION.—In a prosecution for murder an instruction on self-defense that "it must appear to the defendant, at the time of the difficulty, that the danger was so urgent and pressing that, in order to save his own life or to prevent him receiving great bodily injury, the killing of deceased was necessary," is not erroneous as taking away the right of one to stand his own ground in his own home and to resist assaults. (Page 620.)

2. SAME—SELF-DEFENSE—DEFENSE OF HABITATION.—Evidence that the accused killed his assailant while standing in the door of the accused's home will sustain a finding that the killing was not in necessary self-defense where the accused could have closed the door and avoided the necessity of the killing. (Page 621.)

3. TRIAL—MISCONDUCT OF ATTORNEY.—A conviction in a criminal case will not be reversed because the prosecuting attorney invited five of the jurors and one of defendant's counsel to join him in drinking limeade where nothing was done or said to prejudice the defendant's rights. (Page 622.)

4. JUROR—COMPETENCY.—A juror will not be rendered incompetent by an opinion based upon rumor merely where he states that he can discard such opinion and try defendant upon the evidence. (Page 623.)

5. SAME—DISQUALIFICATION—PREJUDICE.—Where defendant accepted a juror without questioning him as to his impartiality or availing himself of the means afforded for ascertaining whether he was impartial, he will not be heard to complain after verdict that the juror was incompetent because of prejudice. (Page 623.)

6. NEW TRIAL—EX PARTE EVIDENCE.—*Ex parte* evidence as to what occurred at the examination of a juror upon his *voir dire* is competent for the purpose of showing knowledge on part of defendants or his counsel of the fact that a juror had formerly expressed an opinion based on rumor. (Page 624.)

Appeal from Benton Circuit Court; *J. S. Maples,* Judge; affirmed.

*McGill & Lindsey,* and *Walker & Walker,* for appellant.

1. The court's ninth instruction on the question of self-defense ignores the principle that one on his own premises may, without retreating, stand his ground, and repel the invasion of one who comes in violent or tumultuous manner, and is not the law. Kirby's Dig., § 1796.

2. Instruction 11, *as given by the court,* authorized a conviction, even though the jury might find that the defendant honestly believed that he was "then and there in danger of losing his life or receiving great bodily injury at the hands of deceased." As given, the instruction was unquestionably erroneous, and human life and liberty ought to be held too sacred to permit a trial judge, long after the transaction, to interpolate a word totally changing its meaning, as has been done in this case.

3. The act of the prosecuting attorney in inviting five of the jurors, after all the evidence was in and the jury had been permitted to separate, pending the argument, to a cold drink stand to drink with him, and of the jurors in accepting the invitation, was such improper conduct as to warrant a reversal, even though the affidavits of the prosecuting attorney and of the jurors state in effect that "nothing wrong transpired, and that they only took *soft drinks.*" 104 S. W. 872; 77 Ark. 241; *Id.* 19; 74 Ark. 256; *Id.* 489; 71 Ark. 415; 72 Ark. 461; *Id.* 139; 74 Ark. 210; 70 Ark. 305; 65 Ark. 619; 75 Ark. 577; 87 Ark. 461; 2 Am. & Eng. Enc. of L. 755; 93 Ala. 565.

*Hal L. Norwood,* Attorney General and *William H. Rector,* Assistant, for appellee.

1. The fact that the accused was at his home does not change the rule that any killing to be justifiable must *proceed from necessity.* Wharton on Homicide, (3 ed.), Bowlby, § 531; *Id.* 530, 534. Even though the entry be made with intent to take human life or to inflict great bodily injury, the assailant's life can not be taken unless it is necessary to protect the slayer or some member of his family. 49 Ark. 534; 84 Ark. 121; 93 Ark. 409.

2. It is apparent from the trial judge's statement that the eleventh instruction was given in proper form to the jury, and that the instruction was argued to the jury as though

the word "not" was written in the proper connection and place. The jury must, therefore, have understood the instruction, and no prejudice resulted to the defendant. Moreover appellant's objection was general only, as appears from the judge's certificate, which, in the absence of a bill of exceptions proved by bystanders, must be taken as conclusive. 71 Ark. 577; 57 Ark. 1; 56 Ark. 494; 87 Ark. 549; *Id.* 461; 95 Ark. 471.

3. There is no merit in appellant's contention that there was misconduct on the part of the prosecuting attorney and members of the jury because he treated them to limeade. His affidavit and the affidavits of the jurors fully establish the purity of the verdict. 30 Ark. 454; 57 Ark. 8; 66 Ark. 545; 73 Ark. 501.

McCulloch, C. J. The defendant, A. J. Bealmear, was indicted by the grand jury of Benton County for the crime of murder in the first degree in the kiling of one C. C. McAdams on January 17, 1912.

The trial of the case resulted in a verdict finding the defendant guilty of murder in the second degree, and his punishment was assessed at five years in the State penitentiary. His motion for a new trial was overruled, and he has appealed to this court.

The killing is admitted, and defendant relies on a plea of self-defense. The killing occurred at defendant's home on a farm between Bentonville and Rogers. He was an unmarried man, and lived alone, and McAdams lived about a mile from him. He was on friendly terms with McAdams, and they were often together, frequently exchanging farm work with each other. The testimony discloses the fact that defendant and Mrs. McAdams, wife of deceased, were on terms of illicit intimacy, and had frequently had sexual intercourse with each other. This occurred generally at the house of defendant, where Mrs. McAdams had gone to help him in household work. Two days before the killing occurred, defendant went to the house of McAdams, in the latter's absence, and while he and Mrs. McAdams were in the act of having sexual intercourse McAdams returned and caught the pair together. They both testified in the case, detailing what occurred, Mrs. McAdams having been introduced as a witness by the State, and there are some conflicts in their testimony; but

the substance of the testimony is to the effect that McAdams seized his gun and threatened to kill defendant, saying that "If it was not for my children, I would blow your head off, but I am not going to disgrace them." Defendant and McAdams left the house for the purpose of going to the mail box, which was on the roadside not far distant, and afterwards returned to the house in company with each other, and the defendant remained there for dinner. Defendant testified that McAdams demanded that he (defendant) make conveyance to McAdams of all his property, including his farm, and his testimony also tended to show that this demand was the result of connivance between McAdams and his wife for the purpose of compelling him to turn over his property. Mrs. McAdams denied knowledge of any such demand made by her husband, stating that defendant and her husband went off together and returned together. Defendant remained at the house of McAdams from about 10 o'clock in the morning until 2:30 in the afternoon, and was then permitted to leave. Defendant testified that he left with the understanding that he was to go to Bentonville with McAdams for the purpose of having a deed prepared. In the meantime, defendant concluded, upon the advice of some of his neighbors, to leave the country for the time being and to sell his personal property. On the morning of the killing he was at home, and one of his neighbors, a Mr. Landers, was there with him, when McAdams came and knocked on the door. He had in his hand a small pot or kettle belonging to defendant, and he had left home, according to the testimony of Mrs. McAdams, for the purpose of returning this and some other small articles of household effects which had been borrowed from defendant, and also for the purpose of getting some of his own household articles which had been left at the house of defendant. Defendant had related to Landers all that he claimed had occurred between him and McAdams and wife, and had sought Landers's advice. When McAdams knocked at the door, defendant, according to the testimony of Landers, remarked: "That's him now," or "That's Mack now." Defendant went to the door and opened it, having in his hand a small target rifle of 22 caliber, and deceased was apparently unarmed. McAdams asked, standing at the door: "What the hell have you got

that for?" and defendant replied, "I aim to defend myself."
McAdams then handed the pot or kettle to defendant, who
took it and set it down in the house, and got a sack containing
some articles, and handed it to McAdams, who turned and
went to the gate and invited defendant to come out of the
house, saying, "Come out here; I want to talk with you."
Defendant replied: "I have done made my arrangements;"
McAdams replied: "Yes, G— d— you, I have made
mine." Defendant replied: "You go on and attend to your
own business," and added: "You go on off; I don't want no
trouble with you;" McAdams said: "Just crack down on me,
G— d— you, I am not afraid of your gun." These details
are as related by witness Landers, and he says that after the
last statement was made he heard defendant cry out, "Stop!"
and then fired. He states that at the time the shot was fired
defendant was standing by the side of the house door, and
McAdams was standing at the yard gate about twenty feet
from the door. The defendant testified that McAdams had
gone outside the gate, and was coming back inside, and, as he
says, was making an effort apparently to draw a pistol, when
he fired the fatal shot. Only one shot was fired. McAdams
fell at once, and died in about ten minutes. He was unarmed
except that a small pocket knife was found in his pocket.
Defendant and Landers were the only eye-witnesses to the
killing, but a number of other witnesses testified about reaching
the scene soon after the killing, and described the situation
as to the position of the body of McAdams.

The evidence is abundantly sufficient to sustain the ver-
dict. It is true the killing occurred at the house of defendant;
but the jury were warranted in finding that he was in no danger
at that time of personal violence, and that he fired the fatal
shot without any necessity existing for the defense of his person
or his habitation, and that it was done for the purpose of
taking the life of McAdams.

The court gave numerous instructions on the degrees of
homicide, and also instructions on self-defense and other
phases of the case.

The giving of the following instruction is assigned as error:
"In order to justify himself in taking the life of deceased
in self-defense, it must appear to the defendant, at the time

of the difficulty, that the danger was so urgent and pressing that, in order to save his own life or to prevent him receiving great bodily injury, the killing of deceased was necessary."

The argument of counsel seems to proceed upon the idea that this instruction took away the right of one to stand his ground in his own home without retreating and resist assaults. But we do not so construe the instruction. The court nowhere in its charge told the jury that the defendant was bound to retreat in order to avoid the difficulty. This, and other instructions of like import, went only to the effect that, in order to justify the defendant on the ground of self-defense, it must appear that the killing was necessary. This is undoubtedly the law. Wharton on Homicide, § 530 *et seq.* It is applicable to the proof in this case. Though the defendant testified that deceased made a motion as if to draw a pistol, and was advancing through the gate towards the house, the jury could have found that this was not true, and that the shot was fired by defendant without any necessity therefor in the protection of his home. Even if deceased was attempting to draw a weapon, the jury would have been authorized in finding that defendant, standing in his own door, could have closed the door, thereby avoiding the difficulty without killing his assailant. This would not have amounted to a retreat, but merely to taking advantage of the means immediately available for avoiding the difficulty and of the taking of human life.

The following instruction was given over objection of defendant:

"The court instructs the jury that every man's house or place of residence shall be deemed and adjudged in law his castle. Still, if you find from the evidence that deceased went to defendant's house on a peaceful mission, unarmed, and was not the aggressor in the difficulty, and did not assault, or attempt to assault, the defendant with a deadly weapon, and did not make such hostile demonstration as caused the defendant to believe, and he did not honestly believe, that he was then and there in danger of losing his life or receiving great bodily injury at the hands of deceased, then you should find defendant guilty as charged, either of murder in the first degree, or second degree, or voluntary manslaughter, as you may feel warranted from all the evidence before you."

The objection to this instruction was general and not specific, and it is contended that the word "not" was omitted in reading it to the jury. The court certified in the bill of exceptions that in reading the instruction to the jury the word, by oversight, may have been omitted, but that defendant's counsel failed to call attention to that, and that in the argument of the case to the jury the instruction was argued as if it contained the omited word. The trial judge also certifies, in the bill of exceptions, that "it is my recollection I did read it as in." We must accept the certificate of the trial judge as controlling, and he certifies, in substance, that he read the instruction so as to include the word said to have been omitted, and that it was so argued to the jury. Taking the certificate of the circuit judge as true, there was no error committed.

It is unnecessary to discuss the other assignments of error with reference to the giving and refusing of instructions, for we are of the opinion that the trial court followed the decisions of this court in framing his instructions, and that the law of the whole case was properly given in the charge.

The next assignment relates to alleged misconduct of the prosecuting attorney in inviting five of the jurors to take a drink of limeade at his expense. On the consideration of this assignment in the motion for a new trial, the court had before him the affidavits of some of the jurors in question, the prosecuting attorney and one of defendant's counsel. It appears that the prosecuting attoney was passing down the street and found five of the jurors near a drug store, the jury having been, by order of the court, permitted to separate, and that he invited them, together with two of defendant's counsel, into the store, to join him in drinking limeade. There is some conflict as to precisely how the invitation was extended, whether the attorneys for defendant were standing there at the time, or walked up later, but it is agreed that they all drank together at the expense of the prosecuting attorney. Nothing was said at any time about this case, and nothing was discussed that could result to defendant's prejudice in any way. Counsel insist that the mere fact that the prosecuting attorney invited five jurors to take a drink of limeade should be treated as prejudicial. We are unwilling to say that an act of courtesy of this kind should be treated as prejudicial error so as to

vitiate the trial of the case. Opinions may differ as to the propriety of the prosecuting attorney, or any other counsel in a case, extending a courtesy to members of the jury while considering a case, but certainly it would be a very far stretch for this court to reverse the case on account of such an act where it is shown that nothing was said which would tend to prejudice the rights of the parties.

The remaining assignment of error relates to the competency of one of the jurors. It is shown by the affidavits of certain persons that juror Craig, after he had been summoned and while waiting in the courtroom to be called, remarked to two acquaintances that "from what he had heard about the case and from what he had been told about it, he would convict defendant." It is alleged in the motion for a new trial that neither the defendant nor his counsel knew until after the trial was over that the juror had made this remark or that he had formed or expressed an opinion in regard to the merits of the case. The motion is not sworn to, and there is no proof on this point except that the prosecuting attorney files an affidavit to the effect that the juror, on his *voir dire*, stated "that he had formed an opinion and expressed one as to the guilt or innocence of the defendant, based solely upon rumor, that he knew nothing of the facts, and, if selected as a juror, would and could discard all that he had heard, not be influenced by it, and try the defendant solely and entirely upon the evidence introduced in the trial."

Now, the effect of the statement by the juror was that he had merely formed an opinion from what he had heard and from what had been told to him. In other words, the implication from his statement is that it was based upon rumor, and not upon the testimony of witnesses. It does not really show a disqualifying opinion entertained at that time. The defendant was entitled, however, to a disclosure of the fact that he entertained an opinion based even upon rumor, so that he could exercise his peremptory challenge if he so desired; but it devolved upon the defendant, before he can claim prejudice on that score, to show that he had availed himself of the opportunity on examination of the juror to ascertain whether he had formed or expressed an opinion. *Hamer* v. *State, ante* p. 606. The presumption, until the contrary appears,

is that the juror would have disclosed this if examined on that point, or that he did disclose it.

It is unnecessary for us to determine how far *ex parte* evidence may be considered in determining what occurred at the examination of the juror on his *voir dire.* But it is certainly competent for the purpose of showing knowledge on the part of the defendant or his counsel of the fact that the juror had formerly expressed an opinion based on rumor. We are of the opinion, therefore, that no prejudice to defendant's rights had been shown in this case.

The judgment is therefore affirmed.