DAVIS v. STATE.

4340                                                    177 S. W. 2d 190

Opinion delivered January 31, 1944.

*K. T. Sutton*, for appellant.

*Robert L. Bobrick, Ernest Eleischman, Thurgood Marshall, Milton R. Konvitz, Edward R. Dudley, William H. Hastie* and *Leon A. Ransom, amici curiae.*

*Guy E. Williams*, Attorney General, and *Oscar E. Ellis*, Assistant Attorney General, for appellee.

Knox, J. Appellant was charged with the crime of assault with intent to kill, allegedly committed by shoot-

ing one Harold Weaver. Trial resulted in a verdict of guilty and punishment was fixed at imprisonment in the penitentiary for a period of 10 years.

The motion for new trial sets out eight assignments of error, the first four of which are the usual stereotype declarations that the verdict is contrary to the law and the evidence. The other assignments are: (5) the verdict was excessive; (6) the jury was prejudiced; (7) the evidence was insufficient; and (8) "that the defendant was in his home attending to his own business and had every reason to believe that his house was about to be burglarized and that he and his family were in danger of great bodily harm or loss of life and that he had a right to defend himself and his family and home."

The shooting occurred shortly after dark on the night of March 22, 1943, at appellant's home, located about one-half mile west of the little town of Edmondson, Crittenden county, Arkansas, of which town the victim of the assault was marshal, and where he and his wife operated a store, and Mrs. Weaver also acted as postmistress.

Late in the afternoon of that day deputy sheriffs Dixon and Holland came into the community for the purpose of apprehending and arresting one Eddie Mayberry on a charge of larceny. Acting upon information that Mayberry was hiding or being hidden in a house near Edmondson, the location thereof and the name of the family living therein being unknown, they decided to make a search of all of the houses in the neighborhood, and, since Weaver was familiar with the location of the different houses and knew the occupants thereof, and the best method of reaching such places of abode, they called upon him to assist them in making the search.

The three officers had searched all of the houses in the neighborhood except the house of Tee Davis, the appellant. The last house searched by them was that of Will Gilyard. Appellant lived about 200 yards south of Will Gilyard's place. There was a swamp or muddy slough between Gilyard's place and appellant's home. A railroad ran north and south along the east side of the Gilyard home and the Davis home. Because Weaver had

on boots he could and did cross the slough going to the Davis home, but the other officers wearing only shoes found it necessary to first go east to the high ground furnished by the railroad dump and thence back west to the appellant's home. Officer Weaver reached appellant's house sooner than the other officers, and according to his testimony began rapping on appellant's door with his knuckles. The witness testified: "He (appellant) asked who it was and I told him, this is Mr. Weaver at Edmondson. I told him we were looking for Mayberry and I wanted him to open the door and let me look. He said, I asked who you are and I told him again and I probably waited two or three minutes and he didn't come to the door. I thought he was probably trying to get ready to come to the door and he didn't answer and I was knocking on the door and had a flashlight in my right hand. . . . and he cut loose with a shotgun and shot it out of my hand and he shot me in the knuckles and my hunting coat has probably 15 shot in that." The witness testified that he was standing to the side of the door and that his body was out of the range; that after appellant had fired the first shot he, the witness, pulled out his pistol and fired one shot and that appellant then fired a second shot, and that he, witness, ran to the ditch bank and got behind it for protection, and witness thereupon fired two shots from that position; that officers Dixon and Holland rushed up and Dixon called to appellant "to put his gun down and stop shooting, this was the law and to open the door"; that the door was thereupon opened and appellant was standing there with his gun in his hand. Appellant's version of the occurrence is as follows: "A. When Mr. Weaver came to my house on that night, Mr. Weaver come up on the porch and he kicked on the door with his foot, gentlemen, with his foot, and the bottom of his foot, and he bust the door from the cross-bar on the door to the bottom. He kicked the door and said, 'You God damn black son-of-a-bitch, open this door,' and I said, 'What do you want?' and he said, 'Open this door and open it quick,' and when he kicked that frightened me and I hit again the trunk and I fell and when I fell I got my shotgun and turned back

and shot it off.'' Other quotations from appellant's testimony will be hereinafter set out.

Appellant's wife testified in his behalf, but she fails to corroborate his statements as to the abusive language or the kicking on the door. Her testimony is to the effect that the first she heard was Weaver saying open the door; that he didn't tell his name and that her husband asked him what he wanted and that she failed to hear him tell what he wanted and then the shooting occurred.

Deputy sheriff Dixon testified that he was not close enough to hear all of the conversation, but that he did hear the prosecuting witness tell appellant he was Mr. Weaver and that in a few seconds thereafter the shotgun was fired. Officer Holland testified that before the shots were fired and while he and Mr. Dixon were going up the railroad he heard officer Weaver call the appellant and say, ''Tee, this is Mr. Weaver; come to the door, I want to ask you something.'' Officer Dixon testified that after they had gone in the house and taken the gun from appellant he examined the door to see where the shots had gone through and that there was no crack through the door caused from kicking it or otherwise.

Among other instructions given at the trial were instructions 12 and 13, in which instructions the trial court charged the jury as follows: No. 12. ''The defendant contends that he fired the shot in defense of his home or place of residence. Section 2998 of Pope's Digest of the statutes of Arkansas provides: 'Every man's house or place of residence shall be deemed and adjudged in law as his castle.' And § 2999 provides that a manifest attempt and endeavor in a violent, riotous and tumultuous manner to enter the habitation of another for the purpose of assault or offering personal violence to any person dwelling or being therein shall be justification of homicide. A bare fear of those offenses, to prevent which the assault is alleged to have been committed, shall not be sufficient to justify the assault. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party committing the assault really acted under their influence and not in

a spirit of revenge." No. 13. "Therefore, if you find from the evidence in this case that the defendant made the assault acting in good faith and as a reasonable person under the apprehension that his home or residence was about to be entered by some person for the purpose of committing burglary or robbery or for the purpose of assaulting or offering personal violence to any person dwelling therein, and that he fired the shots under that belief, acting in good faith and as a reasonable person, then he would not be guilty of any crime and your verdict should be not guilty. . . ."

Appellant's counsel concede that the instructions above quoted properly declare the law with respect to the rights of a person to defend his habitation, but they insist that there is no substantial evidence in the record from which the jury could have found that appellant was not acting in good faith under the apprehension that his home was about to be entered in violation of his rights.

This argument of necessity must be founded upon the theory that appellant actually did not know who was at the door. Likewise, in order to support such argument, parts of the testimony of appellant must be accepted as true and other parts of his own testimony and all of the testimony offered by the State must be disregarded.

On his direct examination appellant did in fact testify that he did not know who was at the door at the time, and before, he fired the shots, but on cross-examination appellant testified he (Weaver) knocked on the door and said, "this is Weaver." "Q. . . . You knew it was Mr. Weaver that ran the store? A. I didn't know. Q. You had in mind that it was him? A. Yes, I thought it was him. Q. You admit to the jury, in spite of what Mr. Sutton said, you thought that it was Mr. Weaver knocking on your door? A. After he called his name I knowed who it was. Q. He called his name before he knocked, didn't he? A. Yes, sir. Q. When you got your shotgun to shoot through the door, you knew you were shooting at Mr. Weaver? A. It wasn't my intention."

It is probably true that Weaver failed to advise appellant that he was an officer. Appellant was living

within one-half mile of the town of which Weaver was marshal, and although he had lived at such place only about a month prior to the shooting he had resided in the locality of Edmondson for several years. Appellant admitted that he had been in Weaver's store two or three times, and on one occasion he and another person with whom he was having a dispute over an automobile accident called on Mr. Weaver to assist in the settlement of the dispute. These facts and circumstances were sufficient to justify the jury in drawing the inference that the appellant knew that Weaver was an officer.

Weaver's status as an officer and appellant's knowledge with respect thereto is not material. Appellant would not have been justified in firing shots at any one who came to his door in a peaceful manner, seeking admission only by and with his consent, and who was not making "a manifest attempt and endeavor in a violent, riotous and tumultuous manner" to enter appellant's home for the purpose of committing burglary, robbery or for the purpose of assault or offering personal violence to a person dwelling therein.

The testimony of appellant that Weaver violently kicked the door and used vile and abusive language tended to show an attempt to enter in a violent, riotous and tumultuous manner in violation of appellant's rights, and if there had been no other testimony in the record with respect thereto, the trial court doubtless would have been justified in directing the verdict in favor of appellant. Appellant's testimony, however, in this regard is directly contradicted by the testimony of the prosecuting witness, and the testimony of deputy sheriffs Dixon and Holland, and also his testimony is not corroborated by his own wife, who was called as a witness in his behalf, and, likewise, some of the answers elicited from appellant on cross-examination are not in accord with his testimony on direct examination. Under these circumstances it is clear that it was a question for the jury to determine whether the assault made by the appellant upon Weaver was justified as one made in defense of appellant's home or place of residence. *Hall* v. *State*, 113 Ark. 454, 168

S. W. 1122; *Bealmear* v. *State,* 104 Ark. 616, 150 S. W. 129.

It is argued that the evidence is insufficient to justify a finding that appellant had the specific intent to kill the prosecuting witness, Weaver. In the case of *Craig* v. *State,* 205 Ark. 1100, 172 S. W. 2d 256, we again stated that one of the elements necessary to sustain a conviction of assault with intent to kill was proof of a specific intent to take life, and we there said: "In the case of *Lacefield* v. *State, supra,* (34 Ark. 275 36 Am. Rep. 8) Mr. Justice HARRISON, in discussing the character of proof required to establish the intent, says: 'Whilst it is true that every person is presumed to contemplate the ordinary and natural consequences of his acts, such presumption does not arise where the act fails of effect, or is attended by no consequences; and where such act is charged to have been done with a specific intent, such intent must be proved, and not presumed from the act.'

"Although the state is required to prove that the defendant actually intended to kill, it need not depend upon declarations made by the defendant to establish such fact. While the intent to kill cannot be implied as a matter of law, it may be inferred from facts and circumstances of the assault, such as the use of a deadly weapon in a manner indicating an intention to kill, or an act of violence which ordinarily would be calculated to produce death, or great bodily harm. In determining whether or not the intent to kill should be inferred, the trier of the facts may properly consider the character of the weapon employed and the way it was used, the manner of the assault and the violence attendant thereon; the nature, extent and location on the body of the wound inflicted, if any; the state of feeling existing between the parties at and anterior to the difficulty; statements of the defendant, if any; and all other facts and circumstances tending to reveal defendant's state of mind. *Chrisman* v. *State,* 54 Ark. 283, 15 S. W. 889, 26 Am. St. Rep. 44; *Beavers* v. *State,* 54 Ark. 336, 15 S. W. 1024; *Davis* v. *State,* 115 Ark. 566, 173 S. W. 829; *Killian* v. *State,* 184 Ark. 239, 42 S. W. 2d 12; *Higgins* v. *State,* 171 Ark. 1187, 285 S. W. 359. It is not essential that the

intent should have existed for any particular length of time before the assault, as it may be conceived in a moment. *Hankins* v. *State,* 103 Ark. 28, 145 S. W. 524; *Evans* v. *State,* 147 Ark. 69, 226 S. W. 1063; *Slaytor* v. *State,* 141 Ark. 11, 215 S. W. 886.''

We are of the opinion that under the facts and circumstances disclosed by the record here the jury was fully warranted in finding that appellant entertained the specific intent to kill at the time he fired the shots through the door.

During the course of the cross-examination the prosecuting attorney asked appellant if he hadn't fired a shot into a wagon load of cotton pickers in 1937. Objection was made to the question on the ground that such inquiry could go only to cases where the defendant was convicted of the crime. The court sustained the objection, and, thereupon, the prosecuting attorney asked appellant if he had not been convicted and sentenced for such crime, and appellant admitted that he had been. No objection was interposed by counsel for defendant to this line of questioning, and no exception whatever was preserved. It is now argued that this prejudiced the minds of the jury against the appellant and constituted error, calling for reversal of this cause. It is well settled by our decisions that a defendant who testifies in his own behalf may on cross-examination be interrogated with respect to prior crimes for which he has been convicted. It is also well settled by our decisions that where no objection to the introduction of evidence is made and exception to the ruling of the trial court thereon preserved in the record it will not be considered for the first time on appeal.

It is earnestly insisted that the sentence imposed in this case is excessive. As was said in the case of *Cheney* v. *State,* 205 Ark. 1049, at 1053, 172 S. W. 2d 427: ''In fixing the punishment for the crime of assault with intent to kill, our lawmakers, in § 2961, Pope's Digest, have very wisely given to the jury much latitude. It is provided in that section that the punishment may be fixed at 'imprisonment in the penitentiary not less than

one nor more than 21 years,' the evident purpose being that the punishment in each case should be fixed in accordance with the facts.

After a careful consideration of the facts and circumstances presented by the record here before us, we find nothing which shows that the jury abused its discretion in fixing punishment.

Finding no error, the judgment is affirmed.