RAY HOLLAND v. STATE OF ARKANSAS

5-5415                                                       442 S.W. 2d 218

Opinion Delivered June 2, 1969
[Rehearing denied July 14, 1969.]

*Murphy & Carlisle* for appellant.

*Joe Purcell*, Atty. Gen.; *Don Langston*, Asst. Atty. Gen.; *Jerry D. Pinson*, Asst. Atty. Gen. for appellee.

CARLETON HARRIS, Chief Justice.   This is an appeal by Ray Holland from his conviction of the crime of assault with intent to kill.   Holland was found guilty by the Washington County Circuit Court, sitting as a jury, and his punishment fixed at five years in the State Penitentiary.   The court further ordered that pronouncement of three years of this five-year sentence be deferred upon the good behavior of the appellant.   Six points are urged for reversal, but we can only consider one, the sufficiency of the evidence, since none of the other alleged errors were set out in the motion for new trial.   We do not consider asserted errors not preserved in the motion for new trial.   *Hardin v. State,* 225 Ark. 602, 284 S.W. 2d 111.

The testimony reflects that appellant and his wife, Hazel, were divorced in October, 1967, the wife receiving custody of the minor son, 10 years of age. In March, 1968, Hazel married Kenneth Cecil Lawson, and the parties lived in Fayetteville.   Mrs. Lawson testified that a restraining order had been issued against Holland, restraining him from coming about the Lawson home, but on the morning of October 10, 1968, around 9:30 or 10:00 A.M., she saw her ex-husband standing in the street, taking the license numbers of her automobile and her husband's pickup truck.   She inquired as to the reason for his presence, and he replied, "Go ahead and call the police."   Mrs. Lawson announced that that was exactly what she intended to do, and asked Holland what he was going to do, appellant replying, "A damned plenty."   Holland left, and Mrs. Lawson said that soon thereafter, her husband also left to take her car to the garage, something being wrong with the transmission. The witness stated that she, after thinking over Holland's actions in taking the license numbers, left the house (in the pickup truck) for the purpose of going to police headquarters.   However, she observed the Lawson automobile stopped on 15th Street, and also saw Ray Holland turning his car around, and coming back in her direction.   She parked the pickup behind the Lawson

automobile, and saw Mr. Lawson lying on the ground, "just as bloody as he could be all over." She did not see the encounter.

Hershel Rogers testified that, on the morning of October 10, as he pulled out of Wal-Mart, and headed east on 15th Street, he observed two cars stopping about 200 yards ahead. Upon getting closer, he saw the occupant of the front car, a 1959 Mercury, get out of his vehicle, and go around to the back car, a red Ford, the occupant of that automobile being in the act of getting out of his car, and the two went into a "clinch." According to the witness, this occurred about at the opening of the Ford door on the driver's side. The two automobiles were about 60 feet apart. Rogers stopped his automobile, and observed the fight. One man (Lawson) seemed to be getting the worst of the fight, and broke away. Rogers then observed that this man, who ran west from the scene about 200 feet, had bloody spots over his clothes. The witness left to call the officers.

Glenn Riggins, criminal investigator on the police force of Fayetteville, testified that a call was received about the occurrence, and officers started to the scene, but before arriving there, received a radio message that Holland was already at the station. They returned, and, according to Riggins, another officer, Richard Wells, advised Holland of his constitutional rights by reading from a waiver.[1] Holland then admitted that he had cut Lawson with a knife, and a pocket knife was taken from appellant, which appeared to have blood stains on it.[2]

Kenneth Lawson testified, as follows:

"I started out to see about my car and I seen his car in front of me. He pulled over and stopped

[1]This waiver contained all of the so-called **Miranda** warnings. **Miranda v. Arizona,** 384 U.S. 436, 16 L. Ed. 2d 694 (1966).

[2]Holland made a statement at the station, but the court did not admit it into evidence, as it was unsigned.

and I stopped. I was going to ask him—now, I didn't know Mr. Holland personally but I did recognize the car and the car had been following me on previous occasions. When I'd take the kids to school, when I'd be going to and from work, and I wanted to know why. I stopped to ask him why. I didn't get a chance to say a word. He come out of his car and he said, 'You son-of-a-bitch, you've caused me enough trouble. I'm going to kill you.' And he come out with a knife.''

The witness said that he had no weapon of any sort, but was finally able to break away from appellant. He denied that he left his house to "go out after Holland.''

Dr. John W. Vinzant, of Fayetteville, testified relative to the wounds received by Lawson, as follows:

''The man had sustained several knife wounds and had a blood pressure at that time of around eighty systolic with shock. * * * He had seven stab wounds over the shoulder, the thorax above the belt. Two of these wounds were severe, the others were minor. One penetrated the thoracic cage[a] on the left. * * * Cut a rib in two, went through the diaphragm and lacerated the liver.''

The doctor testified that the wounds indicated the application of considerable force; that the wound caused by the blow that cut the rib in two was 3 or 3½ inches long, and approximately 2 inches deep. "It went clear through the thoracic wall." The witness said all seven wounds required stitches to be closed, and he stated that Lawson was in serious condition when he (Vinzant) saw him. The doctor testified that Lawson had a collapsed lung," and remained in the hospital for nine days; further, that the liver was also cut, and Vinzant described a particular wound over the heart, which he found to be serious, as follows:

---

[a]The doctor explained this as "the lung, into the lung cavity."

"Directly over it [the heart] and into the thoracic cage. Again, the lung could have collapsed but for some reason, it didn't, on that side."

More specifically describing this wound, the witness said:

"This wound was approximately two and a half inches in length, it went laterally or in a circle around the body between the ribs. It went completely through the chest wall which would be about the same thickness as the other one, around two inches, and you could explore it with your fingers and touch the heart and lung."

Holland testified that he was copying the license numbers because he understood that one of the vehicles was registered in the name of Holland, and he was "curious." He said:

"Well, Hazel came rushing out of the house there and commenced to throw one of her usual hissies. * * * 'What are you doing out here bothering us? Why don't you go away and let us alone?' * * * I just went on and let them alone. I had the numbers that I wanted."

Holland said that he knew someone was following him, and he was suspicious that it was Lawson; the car behind caught up with him at a stop light, and followed him "bumper to bumper" to where appellant stopped his automobile. The record reflects the following:

"Well, I got out to see what was going on and he jumped out of his car and he was messing around there behind the door of his car. I thought he was coming out with a pipe or a tire tool.

Q. Then what occurred?

A. Well, I pulled my knife out and waded in on him."

He said they "came together," and Lawson struck him, and "that's when I went to work [meaning that he used his knife]." When asked if he held any ill will toward Lawson, he said, "Not a thing only over my children. I want to see those children.'* Appellant said that Lawson had no weapon, "but I thought he would have." He stated that, if he had wanted to kill Lawson, he could have done so, but he was only interested in "getting him away from me."

Of course, the court, sitting as a jury, was the fact-finder, and it apparently did not believe Holland acted in self-defense. In *Davis* v. *State*, 206 Ark. 726, 177 S.W. 2d 190, we said:

"Although the state is required to prove that the defendant actually intended to kill, it need not depend upon declarations made by the defendant to establish such fact. While the intent to kill cannot be implied as a matter of law, it may be inferred from facts and circumstances of the assault, such as the use of a deadly weapon in a manner indicating an intention to kill, or an act of violence which ordinarily would be calculated to produce death, or great bodily harm. In determining whether or not the intent to kill should be inferred, the trier of the facts may properly consider the character of the weapon employed and the way it was used, the manner of the assault and the violence attendant thereon; the nature, extent and location on the body of the wound inflicted, if any; the state of feeling existing between the parties at and anterior to the difficulty; statements of the defendant, if any; and all other facts and circumstances tending to reveal defendant's state of mind."

---

*The reference "children" included the two daughters of Mrs. Lawson by an earlier marriage, these children having been adopted by appellant during his marriage to the present Mrs. Lawson.

Certainly, there was substantial evidence to support the verdict. Holland was the first to stop his automobile, and he immediately pulled his knife, though the evidence clearly shows that Lawson was unarmed. Without making any effort to ascertain whether the prosecuting witness had any sort of weapon, appellant, according to his own words, "pulled my knife out and waded in on him." The number of times appellant struck Lawson with the knife, and the severity of the wounds are clear indications that Holland had the intent to kill.[3] In fact, it seems rather remarkable that Lawson did not die, having a rib cut in two, the diaphragm completely penetrated, a lacerated liver, a collapsed lung, and the knife going so completely through the chest wall that the doctor testified that the heart and lung could be touched by the finger. The evidence is more than ample to support the judgment.

Affirmed.

---

[3]From the record: "Q. Then when you got down to the jail, you asked somebody, you said, 'Is that bird dead yet?' Some of the police officers? Didn't you? The Court: Did you say that? A. I don't recall saying that in that particular way. Mr. Coxsey: Just a moment. Q. To Riggins and Hutchens, and this young man, Wells? I'll ask you if you didn't say this, or this in substance, 'Is that bird dead yet?' A. I don't recall saying it in that—. Q. How did you say it? A. I really don't recall the exact words. Q. The fact is that you expected him to die and you asked him if he wasn't dead yet, and you said 'That bird,' now didn't you, Ray? A. I am not going to admit to that, Ted, because I don't think I said it. Q. Are you going to deny it? A. I can't very well deny it but I am still not going to admit that I said it. Now, if Mr. Wells says I did, I'm not going to argue with him."