GREGORY L. FORD *v.* STATE OF ARKANSAS

5537                                    460 S. W. 2d 749

Opinion delivered December 21, 1970

*William C. McArthur,* for appellant.

*Joe Purcell,* Attorney General; *Don R. Rebsamen,* Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. Appellant, Gregory L. Ford, was convicted of Assault with Intent to Kill and the jury fixed his punishment at three years imprisonment in the state penitentiary. From the judgment so entered, appellant brings this appeal. For reversal, it is first urged that the court erred in holding that appellant was legally arrested, this contention being based upon the assertion that there was not probable cause for said arrest. It is further contended that the

court erred in admitting into evidence a statement taken from appellant, the statement according to appellant being involuntary, taken under coercion, and taken after a failure to duly warn appellant of his constitutional rights. It is further asserted that the court erred in admitting into evidence a firearm purportedly used by appellant, and it is finally asserted that there is no substantial evidence to support the verdict.

The first contention is based upon the fact that Ford was arrested without a warrant, and appellant asserts that the testimony indicates that officer Ed Presley, a deputy sheriff of Pulaski County, Arkansas, and who was the principal investigator of the occurrence, could not name his informants, had not used the informants in previous instances, and had no idea as to their reliability. The proof in the case reflected that deputy sheriffs Darrel Rook and George Garrett investigated a disturbance at approximately 11 p.m. on August 31, 1969, at Ashley's Bus Stop near Jacksonville. Other officers were already present at the scene when they arrived. Approximately 250 people had gathered there and Arthur Young, also a deputy sheriff, asked the crowd to disperse and go home, a large number complying with the request; however, a crowd estimated by different witnesses, at from 75 to 150 persons remained. In a few minutes, rock throwing commenced by some person or persons, and Garrett, who was still sitting in his automobile, reached down to get his microphone, then straightened up. From the testimony:

"I heard something like I had stepped in a covey of quail, unexpected type of noise, and then it felt like someone hit me up side of the head with something real hot. Then I heard a report of a gun and as I tried to turn my head, a stream of blood went around to where I couldn't hold the microphone to my mouth and call for help."

Garrett had been injured by the pellets from a shotgun. One pellet struck the side of the nose, passing into the large bone and protruding out the left side of the bone; another pellet went through the cheek and

broke two teeth out of a denture; one went through the ear, one on each side of the chest, four in the arm, two in the side, one in the knee, and one in the leg.[1] Following the shooting, the investigation immediately commenced, and continued for approximately a week.

We do not agree that there was no probable cause for the arrest. The matter of showing the reliability of an informant is not at issue in this case, for officer Presley stated that he had not known these informants prior to the shooting of deputy sheriff Garrett. But surely no one would contend that because they had never previously given any information which could be tested for reliability, the officer should have ignored what he was told by them. Let it be remembered that this apparently was not a crime which had been planned days or even hours in advance (which is generally the case where the police make use of an informant) but rather occurred as an indirect consequence of a disturbance that had just taken place, and where at least several dozen people were congregated. Appellant has said that the evidence "indicates" that Presley could not name his informants; the transcript however reflects that the officer was never asked the names of these individuals. When interrogated as to how the people (informants) knew appellant had fired the shot, Presley answered "They was at the place". This testimony is certainly indicative of the fact that these particular persons saw Ford fire the gun, and apparently this was the view taken by defense counsel, since he asked no further question relative to this phase of the case. It also appears that a number of other people mentioned Ford, but their information was more indefinite.

As to the statement made by Ford, officer Presley testified that Ford was arrested about 8:30 p.m. on August 4, but was not questioned until the next morning. Presley said that the first thing he did was to advise appellant of his rights, as he expressed it, the "Miranda Warning". The deputy sheriff stated that he carried the card with him at all times containing the several warn-

[1]Several of the pellets are still in Garrett's body, the doctors being unwilling to remove them for fear of further damage.

ings that the United States Supreme Court, in *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, held to be required before a prisoner could be interrogated.[2] At the trial, the first examination of Presley took place in chambers, and Ford also testified in chambers, stating that he and his brother had been picked up by the officers "I think it was on Tuesday evening, right after I got out of school". Ford stated that he was told that he and his brother had shot the sheriff. He said that he was not told that he had a right to remain silent, the right to an attorney, or that anything he said could be used against him. Appellant further stated, in response to a leading question from his attorney, that he was told that his brother would be permitted to go home if he (appellant) signed a statement. While not altogether clear, it appears that the younger brother was permitted to go home that night, and if appellant's statement was correct, the officers were unusually trusting, for it is admitted that, though arrested on Tuesday evening, appellant was not questioned until the next morning. If such a statement were made, it would seem logical that they would have obtained the signature on the statement *before* they ever released the brother. There was no other evidence which indicated in any way that appellant's assertion was true. At any rate, this was a question to be determined by the trial court. Ford admitted that he did make a statement that he shot at an automobile. The evidence clearly reflects that only one shot was fired, and several witnesses stated that there was no other traffic in the area. There was no contention that appellant had been physically mistreated in any manner. Of course, we have again a situation where the testimony is in conflict. Both versions cannot be correct. The court, after hearing the evidence mentioned, held that the statement was voluntarily made, and there is certainly substantial evidence to support that finding. Following the hearing in chambers, Presley testified before the jury and read the statement made by Ford, which is as follows:

"I have been advised of my rights and I make this statement freely. The night of the shooting, a fight

[2] No waiver was signed by appellant; Presley stated that he did not have a waiver form with him.

started at the skating rink. We came home to get some guns because the other group had guns and one of the boys in the group said he was going to kill me so I got Larry's gun, that's Larry Barron, and came up to the malt stand and as the car that we was supposed to shoot at went by, I shot at the car and accidentally hit the officer. I then ran and gave the gun back to Larry. Signed Gregory Ford."

We sustain the court in its finding that the statement was voluntarily made.

It is contended that the shotgun which had been obtained from Larry Barron after Ford made his statement, was improperly offered into evidence, but this point is based on the contention that the statement itself was involuntarily made, and the obtaining of the shotgun thus came under the doctrine "Fruit of the poisonous tree". We have already held that the confession was voluntarily made, and that being true, there can be no merit in the contention relative to the shotgun.

Finally, it is argued that there is no evidence to support the verdict of assault with intent to kill, appellant stating, "There is no showing of intent to kill or injure George Garrett, the victim in this cause, and appellant's statement indicates that he had no intention of inflicting harm to the victim". We do not agree. In *Davis* v. *State*, 206 Ark. 726, 177 S. W. 2d 190, this court said:

"Although the state is required to prove that the defendant actually intended to kill, it need not depend upon declarations made by the defendant to establish such fact. While the intent to kill cannot be implied as a matter of law, it may be inferred from facts and circumstances of the assault, such as the use of a deadly weapon in a manner indicating an intention to kill, or an act of violence which ordinarily would be calculated to produce death, or great bodily harm. In determining whether or not the intent to kill should be inferred, the trier of the facts may properly consider the character of the weapon employed and the way it was used, the

manner of the assault and the violence attendant thereon; the nature, extent and location on the body of the wound inflicted, if any; the state of feeling existing between the parties at and anterior to the difficulty; statements of the defendant, if any; and all other facts and circumstances tending to reveal defendant's state of mind."

While the record reveals no prior difficulties between the parties, it appears evident that there was an intent to kill. Appellant did not testify before the jury, nor was there any testimony offered on his behalf. Accordingly, the evidence as to intent must be ascertained, not only from appellant's statement, but from surrounding circumstances, and the nature of the act itself. Actually, the statement signed by appellant, and heretofore set out, does not confess guilt to the charge, for Ford said that he accidentally shot the officer. It is not entirely clear whether he means that he intended to shoot at the occupants of another vehicle, (rather than Garrett's vehicle) or whether he was simply saying that he shot at the officer's *car*, and only accidentally hit the officer. The best indication from the statement is that he meant he was shooting at another vehicle or its occupants, rather than the car operated by Garrett. However, as previously mentioned, the testimony reflected that no other car was being driven in the area at the time of the shooting; in fact, testimony from the officers revealed that all traffic had been stopped prior to the shooting. This was a strong circumstance that the car shot at was the automobile intended by appellant. It would seem strange indeed that Ford would be shooting at somebody from a rival "group" when so many police officers were present. If on the other hand, Ford, in his statement, meant that he only shot at the officer's car, not intending to hit Garrett, the jury certainly could have found that the nature of the wounds were indicative of the fact that the gun shot was directed at Garrett himself. As previously set out, the officer was struck in the nose, the shotgun pellet lodging in the bone, cheek, ear, both sides of the chest, arm, side, knee, and leg by a blast from a 12 gauge shotgun. It is apparent that Garrett was rather lucky, for if the contents of the shell had struck him at other parts of

the body, he could have been killed or suffered great bodily harm, including blindness. The evidence was sufficient for the jury to reach the verdict returned.

Affirmed.