## HALL v. STATE.

### Opinion delivered June 22, 1914.

1. HOMICIDE—SELF-DEFENSE—DEFENSE OF HOME.—In a prosecution for murder, instructions held to cover the right of defendant to defend his person, the inmates of his house, and his house itself from outside violence. (Page 460.)

2. HOMICIDE—SELF-DEFENSE—DEFENSE OF HOME.—In a prosecution for murder, it is proper to refuse to give a requested instruction which tells the jury, as a matter of law, that the right given a man to defend his home extends to the premises surrounding it, regardless of whether the assailant intended to enter the dwelling or not. (Page 460.)

3. HOMICIDE—SELF-DEFENSE—DEFENSE OF HOME—COMMON LAW RULE.—At common law an assault upon a man's house was an assault upon himself, and he could therefore repel such an assault by the force necessary to meet it. (Page 461.)

4. HOMICIDE—SELF-DEFENSE—APPREHENSION OF DANGER—DWELLING.—In order to justify a killing in defense of one's home, or the inmates thereof, it is not necessary that there should be actual danger, provided the defendant acts upon a reasonable apprehension of danger. (Page 461.)

5. HOMICIDE—DEFENSE OF HOME.—It is the duty of a householder to prevent an entry therein, by means not fatal, if he can do so with means consistent with his own safety. (Page 461.)

6. HOMICIDE—SELF-DEFENSE—DEFENSE OF HOME.—If defendant kills in self-defense or defense of his home, where there are no reasonable grounds of apprehension of danger, it is manslaughter, and if deceased is attempting to enter defendant's dwelling house unlawfully, if the killing is with malice and ill will, and not for self-protection or the protection of the home, it is murder. (Page 462.)

7. HOMICIDE—SUFFICIENCY OF EVIDENCE.—Evidence held sufficient to warrant a verdict of guilty of murder in the second degree. (Page 463.)

8. APPEAL AND ERROR—BILL OF EXCEPTIONS—ERRORS NOT SET OUT IN BILL OF EXCEPTIONS.——It is the office of the bill of exceptions to bring upon the record matters which do not appear upon the record proper, and errors which do not appear in the bill of exceptions can not be reviewed on appeal, although set out in the motion for a new trial. (Page 463.)

Appeal from Conway Circuit Court; *Hugh Basham,* Judge; affirmed.

### STATEMENT BY THE COURT.

The defendant, Charley Hall, was indicted for the crime of murder in the first degree, charged to have been committed by shooting John Williams.

Lee Rhodes, for the State, testified: John Williams, a white man, and Layton Fulton, a negro, had a difficulty about some stock, and the negro knocked him down with a stick. Williams left the scene of the difficulty, and came on down to a neighbor's house and got a shotgun. I approached him and tried to get him not to go back. He was angry and would not stop. I went with him and got him to give me his knife, but was unable to get him to give me the gun. As we were going along a road which ran between the defendant Hall's house and lot and barn, the defendant came out into the road and stopped us. Williams told the defendant to go back; that we were not going to bother him, but were after Layton Fulton and were going to the house of a man named Cross, who lived some distance beyond there. The defendant told Williams that he would have to get back and get off of his premises. Williams insisted that he was going to Cross's and was not going to the defendant's house, and that he did not intend to harm the de-

fendant. The defendant, Hall, walked up to Williams, took hold of his gun and wrested it away from him, extracted the shells from it, and handed it to a negro named Steve Whitley, who was with him. The defendant abused Williams and myself, cursing us and telling us to get back, that we could not mistreat him, and finally threw his own gun down on Williams, which had been handed to him by Steve Whitley after the defendant had taken Williams's gun away from him. When the defendant drew his gun on Williams, Williams grabbed the gun and both he and myself begged the defendant not to shoot and said that we did not intend to harm him. Steve Whitley then took hold of the gun which the defendant, Williams and myself were scuffling over, and jerked it out of Williams's hand. Williams then started to whirl and run, and the defendant threw the gun down on him again and shot him, killing him instantly. The deceased fell in the road where the difficulty took place. There was no fence around the yard and house of the defendant, but there were indications of where an old fence had been. There was a road running by the defendant's house between his yard and the barn, and it was in this road that the difficulty and subsequent killing took place. The road in question was not a public road, but was one that had been traveled by those living in the neighborhood for several years. The killing took place about fifteen steps from where the yard fence had formerly been. After the defendant shot the deceased, I cut him with Williams's knife and then dropped the knife down on the ground.

Other witnesses for the State testified that they heard the defendant talking in an angry tone of voice and came to the scene of the difficulty. They corroborated the testimony of Lee Rhodes, and one of them said that just as he came up the defendant said: "You God damned son-of-a-bitch, get back out of here and get away. I have got a damned good notion to kill both of you."

All of the witnesses for the State say that the defendant told the deceased to go back; that he would kill

him and those with him if he did not; that the deceased told the defendant that he was not after him, and was going on up the road. They all stated that the killing took place in the road a short distance beyond the pump and between the pump and the house. An officer who arrested the defendant stated that the next morning after the killing, the defendant told him that he did not kill the deceased but that Steve Whitley had shot him.

The defendant, Charley Hall, testified in his own behalf as follows: I have lived down in the bottom for twenty years, and never had any trouble with the white people before. I had been away from home on the day of the killing and met John Williams on my return home. He told me that some of the negroes had hit him and that he was going home and kill them all. There had never been any hard feeling between us up to this time. I went on home and telephoned to Plumerville for an officer, telling him there was going to be trouble and that I wanted protection. Layton Fulton had taken refuge in my house. Shortly after I returned home I saw John Williams and Lee Rhodes coming up the road toward my house with a gun. I took my gun and started out to meet them. On second thought, I handed my gun to Steve Whitley, who was with me, and started ahead of him to meet Williams and Rhodes. There is an open way between my house and the lot and garden which was usually traveled by the neighbors. I met Williams and Rhodes near my pump and tried to persuade them to go back. After I had taken Williams's gun away from him they advanced on me, and either Williams or Rhodes stabbed me. I then brought up my gun, which Steve Whitley handed to me, and shot Williams in order to save my own life. I was trying to keep them from going into my house and to keep them from stabbing me when I shot the deceased. The deceased was not in my yard when I shot him, but he was in the road right by it and was going toward my house.

Steve Whitley corroborated the testimony of the defendant, and further stated that the deceased was the

one who stabbed the defendant; that it was nearly dark at the time. Whitley also said that when he saw Williams and Rhodes approaching he told them that Layton Fulton was not in the defendant's house.

The jury returned a verdict of guilty of murder in the second degree and fixed the punishment of the defendant at twenty-one years in the State penitentiary. From the judgment of conviction the defendant has duly prosecuted an appeal to this court.

*W. P. Strait,* for appellant.

1.   The facts do not justify a conviction.

2.   Remarks of counsel were prejudicial. 68 Ark. 481; 72 *Id.* 469; 75 *Id.* 577; 70 *Id.* 307; 65 *Id.* 619; 87 *Id.* 464; 74 *Id.* 279; 62 *Id.* 536; 65 *Id.* 389; *Ib.* 475; 69 *Id.* 648; 71 *Id.* 415; 73 *Id.* 453; 74 *Id.* 210.

3.   Defendant had a right to act upon the facts and circumstances *as they appeared to him,* exercising his reason and judgment and viewing them from his standpoint, and the court erred in refusing to so charge the jury. 69 Ark. 649; 59 *Id.* 132; 75 *Id.* 350; Wharton on Hom. (3 ed.), § 340; 55 Ark. 593; *Ib.* 604.

4.   Defendant had the right to interpose *both* the right of self-defense and defense of his home. 55 Ark. 606; *Ib.* 601; 119 Pa. 287.

5.   A man's dwelling (home) includes the property immediately surrounding it and used in connection therewith, such as yard, garden, etc. 58 N. H. 609; 2 Atl. 539; 8 Johns. (N. Y.) 59; 76 Ind. 467. "Habitation" includes surroundings, whether fenced or not. 25 Am. St. 17; 105 Ala. 26; 33 Ore. 110; 1 Shannon (Tenn.) 505; 93 Mech. 609; 94 Ala. 4.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1.   The remarks of counsel were not prejudicial. *Wolfe* v. *State,* 107 Ark.

2.   The instructions cover every phase of murder, and have been approved. 76 Ark. 515.

3. The trial was fair and impartial and the evidence sufficient.

HART, J.; (after stating the facts). The court gave the following instruction at the request of the defendant:

"No. 5. You are instructed that if defendant had reason to believe he or any one at his house would probably be attacked, then as a matter of law he had a perfect right to arm himself and prepare not only for his own defense, but that of his home and all persons being therein at the time; and if deceased, either alone or with others acting with him, advanced upon defendant's home for the purpose of renewing a difficulty with or attacking any person therein, defendant would not be required to retreat, but may stand his ground and meet force with force, and if necessary to prevent either himself or any person in his home from receiving great bodily injury at the hands of the deceased, or him and those with him and acting with him, either or all of them, or if situated as he was, viewing the facts and circumstances as they appeared to him, and from his standpoint he had reason to believe and did believe he or any person at his house was in imminent and immediate danger of losing his life or receiving some great bodily injury at the hands of the deceased or him and those acting with him, any or either of them, and in good faith, without fault or negligence on his part, he shot and killed the deceased, then such killing would in law be justified, and you should acquit the defendant, although you may believe such killing unnecessary or that such danger did not exist."

Counsel for defendant also asked the court to give additional instructions with reference to the defense of his habitation, and error is assigned because the court refused to give them. Counsel contends that instruction No. 5, above set out, limited the right of defendant to shoot the deceased to the defense of his own person or some inmate of his house, but omitted to charge the jury with reference to the right of the defendant to defend his home.

We do not think this instruction restricted or limited the defendant to a defense of his own person or some inmate of his house. It went further, and, in plain and express terms, also submitted to the jury the law of justifiable homicide in the defense of the defendant's home. In addition to instruction No. 5, the court, at the request of the defendant, read to the jury sections 1795 and 1796 of Kirby's Digest, which are as follows:

"Section 1795. Every man's house or place of residence shall be deemed and adjudged, in law, his castle."

"Section 1796. A manifest attempt and endeavor, in a violent, riotous, or tumultuous manner to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein shall be a justification of homicide."

It is next insisted that the court erred in refusing to give instruction No. 3, at the request of the defendant. The instruction is as follows:

"You are further instructed that the right given a man to defend his home against invasion and violence extends to and includes the immediate premises surrounding and environing the house, whether the same is fenced as a yard or not. If you believe from the evidence in this case that deceased, either on his own initiative or with others acting with him, entered the yard or immediate territory surrounding defendant's house and in close proximity to the house and a part of the house premises, in a violent, riotous or tumultuous manner with intent to offer personal violence to any person in or about the house, or thought to be there, and defendant situated as he was, and viewing the facts and circumstances from his standpoint, acting as a reasonable person, believed it necessary to slay the deceased to prevent such invasion and violence, and so believing he shot and killed the deceased, then in law such killing would be justified, and you should acquit the defendant."

We do not think the court erred in refusing to give this instruction. The first sentence of the instruction, in effect, told the jury, as a matter of law, that the rights

given a man to defend his home extended to the premises surrounding it, regardless of the fact of whether the person intended to enter the dwelling house or not. At the common law an assault upon a man's house was an assault upon himself, and he could therefore repel such an assault by the force necessary to defeat it. In discussing sections 1795 and 1796 of Kirby's Digest, in the case of *Brown* v. *State*, 55 Ark. 593, Mr. Justice MANS-FIELD, speaking for the court, said:

"Following the doctrine of the common law, the statute regards the violent attempt to enter the house as equivalent to an assault upon the person to be injured; and when it is obviously about to be made, he may at once put himself in an attitude to repel the aggressor. It was not practicable to give a rule applicable to all cases for determining what acts or conduct will constitute the actual attempt to enter a house. But it must be a 'manifest' attempt; and we take this to mean one so plainly made that no reasonable doubt will exist as to the purpose of the aggressor. At what point the effort to enter the house was begun, and how far it may be permitted to proceed with safety to the life or person of the individual assailed, must be determined by the circumstances of each case. And these are questions more of fact than of law."

In the case of the *State* v. *Patterson*, 45 Vt. 308, 12 Am. Rep. 200, the court said:

"The idea that is embodied in the expression that a man's house is his castle, is not that it is his property, and, as such, he has the right to defend and protect it by other and more extreme means than he might lawfully use to defend and protect his shop, his offices, or his barn. The sense in which the house has a peculiar immunity is, that it is sacred for the protection of his person and of his family. An assault on the house can be regarded as an assault on the person, only in case the purpose of such assault be injury to the person of the occupant or members of his family, and, in order to accomplish this, the assailant attacks the castle in order to reach the inmates.

In this view, it is said and settled that, in such case, the inmate need not flee from his house in order to escape from being injured by the assailant, but he may meet him at the threshold, and prevent him from breaking in by means rendered necessary by the exigency; and upon the same ground and reason as one may defend himself from peril of life, or great bodily harm, by means fatal to the assailant, if rendered necessary by the exigency of the assault.''

It is next insisted by counsel for defendant that the evidence is not sufficient to warrant a verdict of murder in the second degree. In the case of *Brown* v. *State, supra,* the court held that an attack upon a man's dwelling is regarded in law as equivalent to an assault upon his person, and that in order to justify a killing in defense of one's house, or of the inmates thereof, it is not necessary that there should be actual danger, provided the defendant acts upon a reasonable apprehension of danger. But the court further said that it is the duty of the householder to prevent the entry by means not fatal, if he can do so consistently with his own safety. So it may be said that if the defendant kills where there are no reasonable grounds of apprehension of danger it is manslaughter; and if the killing is done with malice, express or implied, it is murder. Even though the deceased is attempting at the time unlawfully to enter the defendant's dwelling house, if the killing is with malice and ill will, and not for self-protection or the protection of the house, it is murder. See *State* v. *Scheele,* 57 Conn. 307, 14 Am. St. Rep. 106. For, as it is there said, ''the law of self-defense, or the defense of one's domicile, does not require the giving to evil-minded persons an opportunity to take the life of another on such easy terms.'' Of course, if the testimony of the defendant is to be believed, he shot the deceased at the time the latter was violently attacking him with a knife, and the killing was done in self-defense. On the other hand, according to the evidence adduced by the State, the defendant had taken the gun away from the deceased and had extracted

the shells therefrom. The deceased was unarmed, and was not in any way resisting the defendant or endeavoring to do him bodily harm. When the defendant drew his gun on deceased he begged defendant not to shoot him, and grabbed the gun in an effort to prevent the defendant from shooting him. The defendant, with the assistance of Steve Whitley, jerked the gun away and immediately drew it on the deceased and killed him. The deceased at the time was begging him not to shoot him, and had several times insisted that he was not going to harm the defendant or try to enter his house. The defendant was talking in a loud and angry manner and applying vile epithets to the deceased and his companion, telling him that they would have to turn back and not travel the road any further. If the jury believed this testimony, there is nothing from which it might reasonably have inferred that the deceased intended violence to the person of the defendant or that he was attempting to enter defendant's dwelling house. The jury might have found that the killing was without provocation and that the defendant was moved by a depraved mind, regardless of human life, without the specifically formed design to take human life essential to murder in the first degree. Under such circumstances, the defendant would be guilty of murder in the second degree, and the evidence was sufficient to warrant the verdict. It was the peculiar province of the jury to weigh the testimony of the witnesses, and this court is not at liberty to reduce the punishment, even though we might think it too severe.

Finally, it is contended by counsel for defendant that the judgment should be reversed on account of certain prejudicial remarks made by the prosecuting attorney in the course of his argument. The remarks of the prosecuting attorney do not appear in the bill of exceptions, but are only set out as exhibits to the motion for a new trial. It is the office of the bill of exceptions to bring upon the record matters which do not appear upon the record proper, and errors which do not appear in the

bill of exceptions can not be reviewed on appeal, although set out in the motion for new trial. *Wolfe* v. *State,* 107 Ark. 29, and cases cited.

We find no prejudicial error in the record, and the judgment will be affirmed.