HILDRETH v. STATE.

4573                         223 S. W. 2d 757

Opinion delivered October 17, 1949.

Rehearing denied November 14, 1949.

*Flowers, Trimble & Davis,* for appellant.

*Ike Murry,* Attorney General, and *Jeff Duty,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. By information filed August 4, 1948, the Prosecuting Attorney for Lee County charged that on August 2d Wesley Hildreth raped a designated female person. The accused appealed from a judgment inflicting the death penalty and procured reversal on the ground that the trial Court erred in refusing to hear testimony relating to his petition for a change of venue. *Hildreth* v. *State,* 214 Ark. 710, 217 S. W. 2d 622.

When the cause was called on remand in April, 1949, the defendant again asked that the venue be changed, resulting in a direction that trial should be in Phillips Circuit Court, at Helena. In appealing, the following statements appear in counsel's brief:

"Appellant, a Negro, was convicted of rape and sentenced to death. The prosecutrix was a young white woman. Appellant did not testify, and no evidence was offered in his behalf. Questions involved are, (1) whether the evidence warrants death where the prosecutrix admits she made no alarm and did not see appellant with any weapon which might produce fear and submission, and (2) whether the Supreme Court may reduce the punishment assessed by a jury".

In support of his plea for substitution of life imprisonment for electrocution, appellant's counsel says: ". . . We wish to emphasize the fact that the consequences of this crime are within the realm of minimum damage to the community and to the prosecutrix".

*First—Sufficiency of the Evidence.*—The victim of appellant's lust was 21 years of age, married, and the mother of a three-months-old child when the attack occurred at the rural tenant home between Marianna and Helena, three or four miles from the paved highway.

The undisputed evidence is that the prosecutrix was attending to her household duties the morning of August 2d when appellant—whom she had never before seen—entered through an open kitchen door; and, as the witness explained it, "he was standing right in front of me when I first saw him". The baby was sleeping in an adjoining room. Appellant's first question was, "Where is your husband?" Without waiting for an answer, appellant went into the baby's bedroom, looking backward as he walked. The mother, thinking the baby might be in danger, followed. Appellant grabbed her and warned that if she screamed he would kill her. He then said, "Did you ever have a date with a colored man?" When the answer was "No", he remarked, "Well, this is one time you are going to have one". Efforts of the young mother to free herself were unavailing. She was "dragged backward to the bed", where the criminal act was consummated.

In leaving, appellant warned that if the woman told her husband what had occurred "I will return and kill you". Disregarding the threat, the prosecutrix ran perhaps a quarter of a mile to where her husband was working in a cotton field. Several hours later treatment was given by a physician, who verified assertions that force had been used. When arrested, appellant admitted to a deputy sheriff that he "had done it". There was corroborating testimony, with identification.

The jury, believing the injured woman and other witnesses, found that violence through fear prevented outcries, the absence of which is emphasized in urging by inference that there was want of resistance, with tacit consent.

It is difficult to see how any verdict other than one of guilt could have been returned. The fact-finders, through instructions, were told that they could fix punishment at life imprisonment, or death. The members of that body must have read, from the expression and demeanor of witnesses, circumstantial and affirmative conduct which satisfied them beyond a reasonable doubt that the act complained of was beyond the borderline of extenuation.

*Second—Supreme Court's Power to Reduce Punishment.*—The right to fix punishment is primarily a duty enjoined upon juries. It is only in cases where evidence does not sustain the degree of crime expressed in the verdict, but does support a lower finding, that an appellant's plea for partial relief may be successful.

*Third—"Consequences to the Community".*—Text writers on criminal law, and court decisions, deal with two classes of crime. Those to which wrong is imputed only because lawmaking bodies have placed them in a forbidden category are spoken of as *mala prohibita;* while acts that are inherently wicked are said to be *mala in se.* In the latter class we find robbery, arson, murder, manslaughter, assault, . . . and rape. Thus, public policy in respect of this most detestable crime found severe expression long before the existence of Arkansas was even remotely contemplated, for in Deuteronomy it was said that "If a man find a betrothed damsel in the field, and the man force her, and lie with her, then the man only that lay with her shall die; but unto the damsel thou shalt do nothing; there is in the damsel no sin worthy of death, . . . for he found her in the field, and the betrothed damsel cried, and there was none to save her."—ch. 22: 25, 26, 27.

Blackstone tells us that the civil law punished ravishment with death and confiscation of goods. Like penalty was exacted by ancient Saxon laws. Gothic or Scandinavian treatment was similar to the Saxon.

It will thus be seen that the death penalty for rape is not a modern innovation, predicated upon race or class consciousness; nor is there to be found in any literature dealing with the law, or with custom, or with social relationships, any support for appellant's proposition that the consequences of rape are negligible to the community and of but minimum importance to the outraged woman.

Affirmed.