Henry GILES *v.* STATE of Arkansas

CR 75-209                                              549 S.W. 2d 479

Opinion delivered April 11, 1977
(In Banc)

414

416

*Jimmie L. Wilson* and *L. T. Simes II,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *Robert A. Newcomb* and

418

*Gary Isbell,* Asst. Attys. Gen., for appellee.

*Patrick Dale O'Rourke, Elizabeth Osenbaugh,* and *Hillary Rodham,* for *Amicus Curiae,* Cummins Prison Project.

JOHN A. FOGLEMAN, Justice. Appellant Henry Giles was found guilty of the murder of Evelyn Drummond in the commission of a robbery and sentenced to death by electrocution in a bifurcated trial. We find error only in the sentencing procedure, and, since we find no other error, affirm the conviction but modify the judgment to a finding of guilt of life felony-murder with a sentence of life imprisonment without parole unless the Attorney General elects to request a remand for a new trial.

We shall consider the points for reversal asserted by appellant and those raised by amicus curiae to the extent necessary to furnish guidance to the trial court on a new trial, if the Attorney General should elect not to accept a reduction of the sentence. It should be noted that amici curiae must take the case as they find it and cannot introduce new issues into the case. *State ex rel Nesbitt* v. *Ford,* 434 P. 2d 934 (Okla., 1967); *Taylor* v. *Commonwealth,* 461 S.W. 2d 920 (Ky., 1970), cert. den. *Brown* v. *Kentucky,* 404 U.S. 837, 92 S. Ct. 126, 30 L. Ed. 2d 70; *State ex rel Baxley* v. *Johnson,* 293 Ala. 69, 300 So. 2d 106 (1974); *Hootch* v. *Alaska State-Operated School System,* 536 P. 2d 793 (Alaska, 1975); *Shaw* v. *Industrial Comm.,* 109 Ariz. 401, 510 P. 2d 47 (1973); *Eugene Cervi & Co.* v. *Russell,* 31 Colo. App. 525, 506 P. 2d 748 (1972); *Sauerman* v. *Stan Moore Motors, Inc.,* 203 N.W. 2d 191 (Iowa, 1972); *Robert Williams & Co., Inc.* v. *State Tax Comm. of Missouri,* 498 S.W. 2d 527 (Mo., 1973); *Kvaalen* v. *Graybill,* 159 Mont. 190, 496 P. 2d 1127 (1972); *Castillo Corp.* v. *New Mexico State Tax Comm.,* 79 N.M. 357, 443 P. 2d 850 (1968); *State* v. *Brannan,* 85 Wash. 2d 64, 530 P. 2d 322 (1975); *Delardas* v. *County Court of Monongalia County,* 186 S.E. 2d 847 (W. Va., 1972). We shall ignore any point asserted by amicus curiae, unless the appellant has properly raised it. In a capital case, or one in which the punishment is life imprisonment, this may be done by a proper objection in the trial court. *Collins* v. *State,* 261 Ark. 195, 548 S.W. 2d 106 (1977); *Robertson* v. *State,* 256 Ark. 366, 507 S.W. 2d 513; *Hays* v. *State,* 230 Ark. 731, 324 S.W. 2d 520; *Young* v. *State,* 230 Ark. 737, 324 S.W. 2d 524; *Rorie* v. *State,* 215 Ark. 282, 220 S.W. 2d 421.

Appellant first argues that the execution of the death penalty in this case pursuant to § 6, Act 438 of 1973 [Ark. Stat. Ann. § 41-4706 (Supp. 1973)] constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States. In support of this point appellant and amicus curiae argue that (1) the statute permits arbitrary selectivity in determining whether a defendant charged with capital felony murder shall live or die, because (a) the imposition of the death penalty is discretionary with the jury, (b) the imposition of the death penalty under this Arkansas statute violates the Eighth and Fourteenth Amendments, just as did the Illinois statute condemned in *Moore* v. *Illinois,* 408 U.S. 786, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972), (c) because the death penalty was vacated by the United States Supreme Court on June 29, 1972, in 117 cases, in spite of the fact that there were a variety of statutes and procedures in the various jurisdictions from which the cases had come for review, (d) because various jurisdictions have invalidated death penalties upon the authority of *Furman* v. *Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), and (2) because of the allegedly uncontrolled selective discretion of prosecuting attorneys, trial judges, juries and the Governor in choosing which defendants will live and which will die in cases in which the death penalty might be imposed.

Most, if not all of these arguments have been rejected by us in *Collins* v. *State,* 261 Ark. 195, 548 S.W. 2d 106 (1977), or in *Neal* v. *State,* 261 Ark. 336, 548 S.W. 2d 135 (1977), and by the majority through plurality and concurring opinions in *Gregg* v. *Georgia,* 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Proffitt* v. *Florida,* 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); and *Jurek* v. *Texas,* 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976). We will not repeat what we have previously said in *Collins* v. *State,* supra and *Neal* v. *State,* supra, but will only give attention to those questions which we have not treated since the above decisions of the United States Supreme Court were rendered.

We do not agree that the vacation of death penalties by the United States Supreme Court in the wake of *Furman,* is of any particular significance, insofar as our statute passed sub-

other jurisdictions mentioned by appellant to be either governing or persuasive as we have viewed the various opinions in *Woodson* v. *North Carolina,* 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944, *Roberts* v. *Louisiana,* 428 U.S. 325, 96 S. Ct. 3001, 49 L. Ed. 2d 974, *Gregg, Proffitt* and *Jurek.* See *Collins* v. *State,* supra; *Neal* v. *State,* supra. We find *Moore* v. *Illinois,* supra, to be of no particular significance since it was an automatic application of *Furman,* much as we made in *Graham* v. *State,* 253 Ark. 462, 486 S.W. 2d 678; *O'Neal* v. *State,* 253 Ark. 574, 487 S.W. 2d 618; and *Kuehn* v. *State,* 253 Ark. 889, 489 S.W. 2d 505.

It is also urged that the sentencing procedures provided by Ark. Stat. Ann. § 41-4701 et seq (Supp. 1973) violate the Eighth Amendment as interpreted in *Furman.* This argument is based upon the assertion that there are no standards provided for the jury's "interjection of any other relevant matter" into the sentencing procedure, under § 41-4710 (c) [Supp. 1973]. That possibility seems to pose no problem of due process. As we interpret the act, the jury's consideration of aggravating circumstances is limited to those enumerated, but consideration of mitigating circumstances ·is not necessarily so restricted. See *Collins* v. *State,* supra, 261 Ark. 195. This would seem to be to the advantage rather than to the prejudice of a defendant.

Arguments relating to the lack of meaningful and mandatory appellate review are like the arguments treated and rejected by us in *Collins* v. *State,* supra and *Neal* v. *State,* supra. The contention that the aggravating and mitigating circumstances enumerated in the statute are not sufficiently precise to pass constitutional muster was also answered on our second considerations of *Collins* and *Neal.*

We do not agree with the contention that the fact that the jury found that the youth of Giles, who was born May 1, 1954, was not a mitigating factor, while in *Collins,* the jury found that the youth of that defendant, aged 20, was a mitigating factor, exemplifies the imprecision of the standards and the potential for unlike results in cases presenting similar circumstances. Appellant points out, as we did in *Neal* v. *State,* supra, that the jury has an opportunity to observe a defendant in making this determination. While we might

agree that chronological age does not necessarily control in the jury's determination whether a defendant's youth is a mitigating circumstance, nevertheless, it is certainly an important factor. Cf. *Allen* v. *State,* 253 Ark. 732, 488 S.W. 2d 712. See our treatment of this question in *Neal* v. *State,* supra. Any hard and fast rule as to age would tend to defeat the ends of justice, so the term youth must be considered as relative and this factor weighed in the light of varying conditions and circumstances. It is well known that two young persons may vary greatly in mental and physical development, experience and criminal tendencies. *State* v. *Holtan,* 197 Neb. 544, 250 N.W. 2d 876 (1977). One of these factors may have greater significance than the others in some cases, depending upon the circumstances. Of course, Giles was, at the time of the trial only four months short of full majority for all legal purposes in Arkansas. We point out that the jury not only observed the defendant in this case but heard him testify and was able to evaluate his response to and evasion of questions directed to him.

We do, however, find error in the sentencing phase of the trial. The jury unanimously found that there were two aggravating circumstances, i.e., that appellant was, beyond a reasonable doubt, previously convicted of another capital felony, or of a felony involving the use or threat of violence to the person and that the capital felony was, beyond a reasonable doubt, committed for pecuniary gain. The evidence was certainly sufficient to support these findings. For the moment, we find it unnecessary to discuss that evidence in detail. Suffice it to say that there is no room for doubting that Giles had previously been convicted of robbery and little room for doubt that he committed the murder for pecuniary gain, i.e., in the perpetration of a robbery. The jury found no mitigating circumstance, but we find no evidentiary basis for this finding. It seems to us that the undisputed evidence clearly indicates that this crime was committed while the capacity of appellant to conform his conduct to the requirements of law was impaired as a result of mental disease or defect.

There is no evidence that the crime was planned.[1] It

---

[1]Of course, we view the evidence in the light most favorable to the jury

seems to have been a matter of impulse, commencing with Giles' finding a wire which he had picked up from the street. Shortly thereafter, he walked down an alley and looked in a window of the Shoe Outlet on Hill Street in Forrest City. He saw Mrs. Drummond, a clerk, alone in the store. He wrapped the cord around her neck, dragged her to the rear of the store, and, when he noted pulsations in her neck, stabbed her twice with a knife. He then rifled the cash register. Immediately thereafter, he found his brother Everett, to whom he stated, without any elaboration, that he had done something wrong.

Dr. Arthur Rogers, a clinical psychologist, employed by the Veteran's Administration in North Little Rock, testified that on the Wechsler Adult Intelligence Scale, Giles was well within the retarded range in intelligence, with a verbal IQ of 51, which he classified as "quite, quite low, to put it mildly." A performance score on a series of puzzles showed an IQ of 76, which was an improvement over a score of 66 on such a test given him at the Arkansas State Hospital, to which Giles had been committed for pretrial observation. Rogers attributed the improvement to practice on the earlier test. Rogers also testified that Giles' overall intellectual percentage came out at an IQ of 59, well within the retarded range. According to this witness, those with IQ's in the fifties were in the lowest one percent of intelligence in the population. The testing, this witness said, showed without question, that Giles was retarded "and fairly gross level," which "in the old language" meant that he was at the borderline between imbecility and moronity in verbal intelligence. In Rogers' opinion, Giles cannot cope, gets upset and angry, and tends to react immediately without thinking ahead, and his psychological controls are limited. He concluded that Giles had little ability for abstract moral concepts, that the world seemed a very confusing place to him and that he had not "gotten into him," in any real sense, the moral values of society. Rogers was of the opinion, from his testing, that Giles had the intelligence of an average seven or eight year old person. He said that Giles' knowledge of arithmetic was essentially nonexistent. He thought Giles could count up to seven and could

verdict. The only direct evidence of appellant's conduct was his confession and the jury obviously accepted it at face value. Accordingly, we treat its recitations as facts.

subtract one from three, but could not figure out change, even from ten cents for a six-cent purchase. He found Giles practically at the zero mark in general information, such as colors of the American flag, etc., and estimated his academic progress at the first or second grade level.

Dr. John Althoff, a psychologist, who examined and tested Giles at the Arkansas State Hospital, was a rebuttal witness for the state. He testified Giles suffered from mental retardation, and assigned a mental age of eight to nine years. He had found some indication that Giles suffered from organic brain syndrome. Another rebuttal witness, Dr. Charles Taylor, a psychiatrist employed by the Arkansas State Hospital, had found a higher IQ of 71 on a Kent Intelligence Test Scale and said that, according to that scale, persons with an IQ of 68 to 83, suffered from borderline mental retardation and between 52 and 67 were commonly known as morons. He had observed appellant having some kind of nervous spell when he was being examined by Dr. Althoff. The State Hospital report had reflected "mild mental retardation, psycho-social deprivation (IQ 66)." Taylor agreed that Giles was on the borderline between a moron and an imbecile.

An imbecile is one of weak mind. Both imbecility and moronity are forms of mental deficiency. While the word "idiot" implies an absence of intellectual or reasoning powers, "imbecile" implies great mental feebleness. An imbecile is commonly incapable of earning a living. A moron is a moderately feebleminded person with a potential mental age of eight to twelve years. Most morons are capable of doing routine work under supervision, and can be happy with tasks too simple and monotonous to satisfy an intelligent person. Moronity is the milder degree of mental deficiency and the moron requires supervision in work, recreation and the general conduct of life as well as in work. See "imbecile," "moron," "mental deficiency." Webster's New International Dictionary, Second Edition; Webster's Third New International Dictionary; Attorney's Dictionary of Medicine, (Schmidt); The American Medical Dictionary, 22nd Ed. (Dorland).

The entire record is indicative of imbecility and organic

brain syndrome to the extent that the conclusion is inescapable that the capacity of Giles to conform his conduct to the requirements of law, when the capital felony was committed, was impaired as a result of mental defect. For this reason, we find error in the sentencing procedure in the jury's failure to find any mitigating circumstances. The jury was not free to arbitrarily disregard reasonable testimony, where other testimony is supportive, rather than conflicting, and no questions of credibility are to be resolved, and it cannot be said that it is physically impossible or that there is no reasonable probability that it is true. *St. Louis, I.M. & S. Ry. Co. v. Spillers,* 117 Ark. 483, 175 S.W. 517; *St. Louis-San Francisco Railroad Co. v. Harmon,* 179 Ark. 248, 15 S.W. 2d 310; *Kentucky Home Life Insurance Co. v. Mosley,* 191 Ark. 1146, 89 S.W. 2d 744; *Barnes v. State,* 258 Ark. 565, 528 S.W. 2d 370. Cf. *Hudson v. State,* 77 Ark. 334, 91 S.W. 299.

If, from the record, we could properly weigh this single mitigating factor against the aggravating factors for which there was evidentiary support, and then say that there could be no reasonable doubt that they outweighed this single mitigating factor, we might affirm the sentence. We could reduce the sentence to life imprisonment without parole if we could find, on the record, that the aggravating circumstances did not outweigh the mitigating one. See *Williams v. State,* 183 Ark. 870, 39 S.W. 2d 295; *Simpson v. State,* 56 Ark. 8, 19 S.W. 99; *Stanley v. State,* 183 Ark. 1093, 40 S.W. 2d 415; *Blake v. State,* 186 Ark. 77, 52 S.W. 2d 644.

The weighing process is not simply a matter of counting the number of aggravating and mitigating circumstances and striking a balance. It is a reasoned judgment to be exercised in the light of the totality of the circumstances. *State v. Dixon,* 283 So. 2d 1 (Fla., 1973). See also, *Hall v. State,* 113 Ark. 454, 168 S.W. 1122. The sentencing authority does not act as a computer, but exercises a reasonable and controlled discretion. *Alvord v. Florida,* 322 So. 2d 533 (Fla., 1975); *State v. Stewart,* 197 Neb. 497, 250 N.W. 2d 849 (1977). But this, primarily, is peculiarly a function best performed, in the Arkansas view, in the first instance by a jury. See plurality opinion of Stewart, J., in *Gregg v. Georgia,* supra; *Witherspoon v. Illinois,* 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776;

*Hildreth* v. *State*, 215 Ark. 808, 223 S.W. 2d 757; *Young* v. *State*, supra, 230 Ark. 737. If the case were remanded, even if we should assume that only the sentencing phase could be retried, it would be necessary that a jury hear virtually all the evidence introduced at the original trial in order to weigh the circumstances. But since the only error we find is in the sentencing procedure, we choose to modify the judgment and enter judgment sentencing appellant to life imprisonment without parole for life felony-murder without parole unless the Attorney General, within 17 days, requests a remand for a new trial. *Williams* v. *State*, supra; *Gaskin* v. *State*, 244 Ark. 541, 426 S.W. 2d 407; *Rorie* v. *State*, supra, 215 Ark. 282.

Appellant raised three points relating to the trial judge's excusing three members of the jury venire for cause because of their attitudes regarding imposition of the death penalty. Fundamentally the grounds asserted are variants of the same argument, but each point is directed toward slightly different contentions. The first is that the due process and equal protection clauses of the United States Constitution were violated. Another is that minimum constitutional standards according to the construction of *Witherspoon v. Illinois,* supra, were not met. The last is that appellant was deprived of his right to a representative jury under the Sixth Amendment to the United States Constitution. We find it difficult to perform the mental gymnastics that would be necessary to neatly compartmentalize the treatment of these points under the labels given them by appellant.

Despite the fact that at least one of these three veniremen gave seemingly equivocal answers to some questions regarding his scruples against the death penalty, each ultimately made it quite clear that he or she would not vote to impose the death penalty, regardless of whatever evidence might be developed. Their objection to the death penalty went far beyond mere religious scruples against, or general objection to, the death penalty. Venireman Roundtree eventually stated that he would automatically vote against the death penalty without regard to the evidence that might be produced. Venireman Brooks also ultimately concluded that she would do likewise. Venireman Horton also stated that she did not feel that she could vote for the death penalty. She then

said that she would automatically vote against it and that the truth was that she could not impose the death penalty. Exclusion for cause in these instances clearly did not violate the rule of *Witherspoon* v. *Illinois*, supra, 391 U.S. 510. See *Venable* v. *State*, 260 Ark. 201, 538 S.W. 2d 286; *State* v. *Mathis*, 52 N.J. 238, 245 A. 2d 20 (1968), judgment rev. insofar as it imposed the death sentence and remanded for further proceedings, 403 U.S. 946, 91 S. Ct. 2277, 29 L. Ed. 2d 855; *State* v. *Elliott*, 25 Ohio St. 2d 249, 267 N.E. 2d 806 (1971), judgment vacated insofar as it left undisturbed the death penalty imposed and remanded for further proceedings, 408 U.S. 939, 92 S. Ct. 2872, 33 L. Ed. 2d 761. The assertion that the trial court pressured Venireman Horton into giving disqualifying answers is wholly without merit. The trial judge must determine the propriety of a challenge and his questions seeking to ascertain the extent of the juror's unwillingness to impose the death penalty were proper. See *State* v. *Mathis*, supra.

Appellant argues that jurors should be permitted to sit during the first or guilt stage of the trial, without regard to their inability to impose the death penalty under any state of facts, totally ignoring the fact that in the bifurcated trial mandated by our statute, the same jury is required to sit in both phases. § 10, Act 438 of 1973 [Ark. Stat. Ann. § 41-4710 (Supp. 1973)]. This forecloses any idea that a juror who could qualify for only one phase of the trial can sit in both, and disposes of appellant's suggestion that, on voir dire, the dual role of the jury should be distinguished. See *Venable* v. *State*, supra. The bifurcated trial approach has been approved by the United States Supreme Court. *Gregg* v. *Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Jurek* v. *Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976). See *Venable* v. *State*, supra.

Appellant also argues that his Sixth Amendment rights were violated because he was not tried by a jury drawn from a representative cross section of the community because those who would not impose the death penalty, without regard to the evidence, were excluded. It seems far-fetched indeed to entertain the idea that such a group is a cognizable or identifiable group or class entitled to a group-based protection so

that it must not be excluded from service on a jury in a capital case. It seems to us that failure to exclude such persons would tend to make the imposition of the death penalty a sort of jury wheel lottery with freakish results, if it did not operate to abolish capital punishment in Arkansas. See *State* v. *Mathis*, supra. Be that as it may, in the ultimate, requiring that no distinctive group be excluded from jury service would require that neither felons nor anarchists be excluded from jury service, not because these groups are similar, but because they are, or may be, groups that constitute a part of the population. Permitting such persons as compose the latter groups to serve on juries would certainly be more nearly a mockery of justice than "consistent with our democratic heritage" or "critical to public confidence in the fairness of the criminal justice system." By the same token, it might well be said that those who would not, regardless of the evidence, vote to impose a sentence of imprisonment, could not be excluded from a jury. The "cross section" idea is certainly not so pervasive as this. It has been said that no group has the right to block convictions. *Apodoca* v. *Oregon*, 406 U.S. 404, 92 S. Ct. 1628, 32 L. Ed. 2d 184 (1972). By the same token, no group should be permitted to block a jury's imposition of a legally authorized sentence.

We find no error and no violation of the Sixth or Fourteenth Amendments to the United States Constitution in the excusing of these three veniremen. See *Neal* v. *State*, 259 Ark. 27, 531 S.W. 2d 17, judgment vacated insofar as leaves undisturbed the death penalty imposed and remanded for further consideration, 429 U.S. 808, 97 S. Ct. 45, 50 L. Ed. 2d 69; *Montgomery* v. *State*, 251 Ark. 645, 473 S.W. 2d 885; *O'Neal* v. *State*, 253 Ark. 574, 487 S.W. 2d 618.

Appellant also sought reversal on the grounds that the lack of blacks on the jury venire and jury panel deprived him of his Sixth Amendment right to a jury trial and the jury selection process was unconstitutional and in violation of the Fourteenth Amendment. This question was not raised at the trial. It was first raised in a motion for new trial and no record was made or tendered. Appellant asserts now that only one black person was a member of the jury panel. This is not disclosed by the record and we have no evidence of the

racial composition of the jury panel, or the jury commission, or the jury. The record is silent on the question, so we cannot consider the matter. See *Bailey* v. *State,* 238 Ark. 210, 381 S.W. 2d 467. In the event of retrial, the situation will probably be entirely different, so we forego further discussion of this argument.

A more significant point for reversal is presented by the argument that a confession made by appellant was erroneously held voluntary by the trial judge. We make an independent determination of this question, based upon the totality of the circumstances, with all doubts resolved in favor of individual rights and constitutional safeguards, but will not reverse the trial court's holding unless it is clearly against the preponderance of the evidence. *Degler* v. *State,* 257 Ark. 388, 517 S.W. 2d 515; *Watson* v. *State,* 255 Ark. 631, 501 S.W. 2d 609. The statement introduced was given while appellant was in custody; therefore the state bore the burden of proving that it was voluntary. There are many factors to be considered. A statement induced by fear or hope of reward is not voluntary. *Greenwood* v. *State,* 107 Ark. 568, 156 S.W. 427. The age, strength or weakness of intellect, and manner of interrogation are matters to which the court should look. *Dewein* v. *State,* 114 Ark. 472, 170 S.W. 582. Presence or absence of friends or relatives may be considered. Manner of interrogation, the lapse of time between advice of constitutional rights required by *Miranda* and the giving of the statement are other factors. *Watson* v. *State,* supra.

Appellant places emphasis upon his ninth grade education, mental deficiency, age, the time lapse between advice of rights and the confession. After weighing all these elements, we cannot say that the holding of the circuit judge was clearly against the preponderance of the evidence. There was considerable conflict in professional opinion on the subject.

Arthur Rogers, the clinical psychologist who testified on behalf of the defendant at the trial also testified at the hearing on the motion to suppress. We will not repeat here those portions of the testimony of this witness on the motion which would be a repetition of his trial testimony outlined above. That which follows is either testimony not given in his trial

testimony or not considered particularly significant by us in treating the previous point. One test administered by this witness found Giles' ability to comprehend grossly deficient. On another test, Rogers found Giles to be a self-centered, suspicious, tense person with a dearth of ability to understand the environment, the culture, the society, the people around him and the complex world in which we live, who, when frustrated, becomes even more anxious and resistant, hostile, and totally befuddled. Still he found him, in many ways, extremely mature. Rogers also found that appellant's reactions were immediate, and that he tended to be very suspicious of other people. He said Giles could not read words of more than two syllables, having an educational level, on a very rough estimate, at the second grade, in spite of his having gone to the ninth grade. It was the professional opinion of this witness that Giles was incapable of knowingly, voluntarily and intelligently waiving his constitutional rights. This opinion was a clinical judgment based upon a behavorial science and derived through tests and observation over a period of two hours at the most. Rogers felt that Giles was incapable of judgment and of comprehending the abstract concepts contained in the warnings given him and that he became confused when called upon to project into the future. He also felt that Giles was capable of understanding the statement, "You have the right to an attorney present here with you," explained in a unitary concept, but that it was quite possible that he did not understand the concept expressed in the statement, "If you don't have money to hire an attorney or get a lawyer to represent you in this case, one will be provided for you." Rogers was of the opinion that an improvement of scores on tests he gave over those administered by the Arkansas State Hospital staff was typical, because the person tested may have learned from the previous test; however, he considered a ten point increase without significance.

Dr. Taylor of the Arkansas State Hospital staff had twice examined Giles for two hours and had seen him informally five or six times, all during a 30-day period of time, during which Giles was under continuous observation in a wing of the State Hospital. Taylor also depended upon daily reports made during this period. It was Dr. Taylor's opinion that

Giles: was intelligent enough to understand the right to remain silent, what a court is and what a lawyer is, as a part of his general understanding and knowledge; had the mental capacity to waive his constitutional rights under *Miranda;* and was capable of understanding the consequences, implications or import of the admonition as to his rights, partly from his past experience. He found that Giles: was able to converse easily on topics he initiated himself and to discuss abstract ideas in plain, but not in abstract, terms; had a speech defect and a mild hearing defect, both of which were more pronounced upon interrogation or in the presence of persons in authority; became confused and emotionally upset when encountering strangers for the first time; was very capable of answering "no" where it was to his advantage and to just appear blank if not to his advantage; and was very difficult to communicate with until one gets to know him.

When the two opinions are contrasted, we cannot say that the opinion of Dr. Taylor should not have been accorded the greater weight, particularly in view of the longer and more comprehensive observation and the circumstances surrounding the taking of the confession. Dave Parkman, the Chief of Police of the Forrest City Police Department, previously Sergeant and Lieutenant in charge of Criminal Investigation, testified that Giles was told that he was charged with this crime about 3:40 a.m. on January 12 following his arrest at midnight. Giles was then placed in a holding cell for approximately one hour, before Parkman talked with him. Admittedly, Parkman read the pertinent constitutional rights to Giles one by one from a "Statement of Rights" form and obtained Giles' acknowledgment of his understanding of each of them, individually, in the presence of Officer Buddy Kennedy. Parkman said that when Giles answered affirmatively to the inquiry whether he understood the statement of a particular right, he appeared to understand, and that he did not start to talk with Giles until it appeared that Giles understood each of the statements. When he commenced interrogation, Giles reacted belligerently and said that he had nothing to say, and denied any knowledge of the murder, and, according to Parkman, Giles was then placed in a detention cell for 30 minutes to an hour, after which he was "processed." When efforts to talk with Henry Giles were

renewed for a period of five to ten minutes in the presence of his brother, Henry again said that he did not know what the officers were talking about and that he had nothing to say. Giles was then taken to the St. Francis County jail and Parkman did not again interrogate him or even see him until the day of the suppression hearing. It is admitted that Giles signed a "Waiver of Rights Form" in the presence of Parkman and Kennedy, but Giles testified that, at the time, he did not understand everything on it. Giles admitted that he understood the meaning of the statements at the time of the trial, but said he had learned what they meant while he was in jail after signing a confession. He admitted that he knew what going to court meant, having gone several times, and that he knew what a lawyer was, having had one every time he was put in jail — specifically on two occasions in Forrest City and one in Little Rock. There was no testimony from which it was even suggested that the confession was induced by any promise or extorted. The real basis of appellant's attack is simply that there was no knowing and intelligent waiver of his privilege against self-incrimination or of his right to assistance of counsel at this critical stage.

Parkman testified that whenever Giles indicated that he did not understand any of the separate statements pertaining to his rights as read to him, that he (Parkman) reread it and explained it. Parkman knew that Giles did not hear well and so he spoke loudly to him. He noted that Giles stuttered pretty badly, but not so that he could not be understood. It seemed to Parkman that the more upset Giles became, the more clearly he spoke, except when he was belligerent and cursing.

Kennedy testified that he was present at 1:20 a.m. on January 23 when Giles signed the waiver of rights. Kennedy had been present when Giles was arrested by Heber Hughes for parole violation, and, a few moments later, by Trooper Sims for possession of marijuana when that officer found a bag of the substance in Giles' shoes. Kennedy corroborated the testimony of Parkman concerning the explanation of the statements pertaining to Giles' rights that Giles said he did not understand.

At approximately 9:00 or 10:00 a.m. on January 13, Henry and his brother, Everett Giles, were taken from the St.

Francis County jail to the Forrest City Police Department by Forrest City Police Officer Gary Christian, Buddy Kennedy and Arkansas State Police Sergeant Finis Duvall for the purpose of interrogation. It seems that the officers first interrogated Everett Giles and then went to lunch. The two brothers were then left in a detention cell in the Forrest City Police Department with Henry handcuffed to the plumbing of a commode. One of the handcuffs was on his left wrist and the other around a pipe. According to Officer Christian, this left Henry Giles in a sitting position but with enough freedom that he could stand if he liked. Christian said that when the officers returned from lunch at approximately 1:30 p.m., Everett Giles told them that Henry was ready to talk to them about the murder and robbery and asked if he (Everett) could be present. The two brothers were then taken to an interrogation room. The only others present were Sergeant Duvall, Anderson and Christian. Duvall had the waiver of rights on his desk there and asked Henry Giles sequentially if he had been advised of his rights, if he had signed it the night before and if he understood these rights. To each of these individually propounded interrogatories, appellant gave affirmative answers and, according to the officers, proceeded to relate, in his own words, what had happened on the day of the murder-robbery, without any difficulty in communication. Sgt. Duvall testified that he wrote the statement as appellant told it, after questioning by the officer, and then read it back to appellant, who signed it when the officer asked him to do so. Appellant testified that he could hardly understand the written statement the way "he got it." He admitted signing it, but denied "telling him all that" and then denied making any of the incriminating statements to the officer.

Most of the testimony of the officers went uncontradicted. The only factor that presents any question at all about the voluntariness of the statement is the question of appellant's understanding of his rights. In arriving at the conclusion that the circuit judge's finding was not clearly against the preponderance of the evidence, we consider several factors other than the testimony of Dr. Taylor, but supportive of it. Some of them are: Rogers' testimony that, in some respects, appellant was very mature and that he did learn from repetition; the presence of Henry Giles' brother Everett

at the interrogation after the two were left alone during the lunch hour; the cessation of interrogation whenever appellant expressed his unwillingness to answer or to talk about the matter, including the recitation in the statement that it was terminated when appellant decided that he didn't want to answer any more questions until they (he and Everett) could talk with an attorney; the statement was signed, not only by Henry Giles, but by Everett Giles; the fact that appellant was no stranger to criminal court proceedings and had previously been accorded the assistance of counsel. Mere low mentality is not a sufficient basis for finding a confession involuntary if the accused is nevertheless capable of understanding his rights and the meaning and effect of his confession. *People* v. *Tipton*, 48 Cal. 2d 389, 309 P. 2d 813 (1957). See also, *Summerville* v. *State*, 253 Ark. 16, 484 S.W. 2d 85; *Sheppard* v. *State*, 239 Ark. 785, 394 S.W. 2d 624, cert. den., 387 U.S. 923, 87 S. Ct. 2038, 18 L. Ed. 2d 977; *Dewein* v. *State*, 114 Ark. 472, 170 S.W. 582; *Mitchell* v. *State*, 206 Ark. 149, 174 S.W. 2d 241.

Appellant suggests that the circumstances surrounding his arrest should be taken into consideration in regard to the voluntariness of his confession, but does not elaborate. We take this to be an effort to argue that the confession, even though otherwise voluntary, was the fruit of the poisonous tree, i.e., an illegal arrest, a point argued more extensively in appellant's assertion that a search and seizure violated his constitutional rights. He was in a private dwelling when awakened near midnight, January 11, by his parole officer (Hughes), who told him that he was under arrest for parole violation. As he was getting dressed, a trooper, who along with Officer Kennedy, had accompanied Hughes, noticed a bag of marijuana in appellant's shoes, and told appellant he was under arrest for possession of marijuana. As the three officers were bringing him out of the house, Parkman drove up, and seeing that the arrest had been made, began to search the house for evidence of the murder-robbery, while Giles was being taken to the city jail, where he was later interrogated and charged with the crime. Appellant first contends that Hughes merely participated in the arrest and was only acting to assist the Forrest City officers to arrest him for "investigation of the murder-robbery." He points out that Parkman testified that Hughes participated in the arrest, and, when asked to what

extent, answered, "To the extent of helping us bring the man out."

In questioning the constitutional validity of a nighttime arrest in a private dwelling, appellant relies principally upon authorities relating to searches of private dwellings without a search warrant, and advances the argument that the doctrine of *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) applies to arrests without a warrant in a private dwelling as fully as it does to searches. Arrest by a parole officer without a warrant is clearly permissible under Ark. Stat. Ann. § 43-2810 (Supp. 1975), and the validity of the statute is not questioned. There seems to be no impropriety in a parole officer's recruiting the assistance of a city policeman or a state policeman, or any other officer authorized to make arrests, to assist him in performing his duty to make an arrest. Appellant concedes that he was on parole. Officer Kennedy stated that he was outside the house looking in the window when Hughes made the arrest. Appellant has not alleged that he had not violated parole or that the arrest was improper for that reason. The arrest was made at the dwelling house of Arnola Anderson in Palestine, where Giles was spending the night. There is nothing in the applicable act to restrict such an arrest to the daylight hours. There was reason for the officers to believe that appellant was in this house on the night he was arrested and he seems to have had an inclination to wander, particularly between Forrest City, Palestine and Little Rock. He was not living with his mother, Roxella Giles, in Forrest City, but he had spent the night at her apartment on the Wednesday before the killing. We do not consider the arrest illegal under these circumstances.

The "search and seizure" contention made by appellant seems to be based only on the argument pertaining to the alleged illegality of the arrest. But the search of the house was made with the permission of the owners of the premises. Therefore it was not a search incident to the arrest. Appellant's boots were taken from him at the police station. Their seizure as potential evidence was proper. *Bailey* v. *State,* 238 Ark. 210, 381 S.W. 2d 467; *U.S.* v. *Edwards,* 415 U.S. 800, 94 S. Ct. 1234, 39 L. Ed. 2d 771 (1974); *Sheppard* v. *State,* supra. See also, *Graves* v. *State,* 256 Ark. 117, 505 S.W. 2d 748.

We have some difficulty in reviewing the validity of any search or any seizure of anything other than the boots because, even though appellant moved to suppress the evidence, the trial court never ruled on the motion and appellant never made any objection to any such evidence during the trial. For this reason, perhaps, the facts surrounding the arrest and search may not have been developed as they would have been otherwise.

Appellant also asserts that the court erred in failing to suppress a lineup identification. The identifying witness was June Slinkerd, who saw appellant at the city jail in Forrest City and identified him as a black man she had seen being waited on by Mrs. Drummond in the Shoe Outlet store on the afternoon of the murder.

The lineup was conducted at about 8:00 a.m. on Sunday morning, January 12. Parkman prepared the lineup. Officer Anderson brought Mrs. Slinkerd to view the lineup, which had already been set up when she arrived at the jail. It consisted of Otis Hinton, Cleveland Deer, Henry Giles, Alvin Vick, Everett Giles, and Anthony King, before whom numbers had been placed. Henry Giles was the youngest person in the lineup. The ages of the others ranged upward as much as twelve years. The heights of the participants ranged from 5'8" to 5'10½" or 11" and their weights, from 160 to 185 pounds.

Anderson testified that Parkman had advised Giles that he had the right to counsel at the lineup. Parkman said that he instructed Mrs. Slinkerd not to make any statement, comment, or gesture toward any individual until they returned downstairs after she had viewed the lineup. Mrs. Slinkerd had been shown some photographs on the preceding Friday, but she had been unable to identify anyone from them, although she had said that one of the persons pictured looked similar to the person she had seen. She was not told that the police had the man they were seeking. In giving the police a description of the person she had seen, she told them that he stuttered, was a black man about 5'10" tall and weighed about 170 pounds. At the discretion of the police, each of the participants stepped forward, stated his name, address and

age. Only one of them stuttered. One of them was wearing pants similar to those worn by the person she had seen in the store.

According to Mrs. Slinkerd and Parkman, when she went downstairs she felt that she was confused as to the number of the person she recognized, and did not remember his name because she couldn't understand him when he spoke, so the officers suggested that she return upstairs. When she did, the participants were in the same positions, but they stepped forward and said something about where they worked or went to school. Mrs. Slinkerd said she gave the officers the number of the person she recognized, which she said was the same number she had recognized before. She said that she had never seen anyone in the lineup previously, except for the person she had seen in the store, and that she had never seen him before she saw him in the store.

When Mrs. Slinkerd testified at the trial she said that the man she had seen in the store was only three or four feet from her, that she had seen his full face and heard him talk.

First we note that there is no indication that Giles ever requested the assistance of counsel, or that he had obtained the services of any attorney, so the lineup did not necessarily constitute a denial of appellant's right to counsel. *Montgomery* v. *State*, 251 Ark. 645, 473 S.W. 2d 885. Furthermore, the charges were not filed until January 15, so the per se exclusionary rule did not apply. *Kirby* v. *Illinois*, 406 U.S. 682, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972); *Pollard* v. *State*, 258 Ark. 572, 527 S.W. 2d 627.

The likelihood of irreparable misidentification is the evil to be avoided. *Pollard* v. *State*, supra. The court held an in camera hearing on the suppression of the lineup. We are inclined to agree with the trial court that the in court identification was not tainted and was therefore admissible. Appellant argues, however, that the fact that he was the only stutterer in the lineup so tainted the procedure that his right to due process was violated. We have held, in a case where the accused was the only person in a lineup with a tatoo on his arm, that due process did not require that a lineup be composed of

persons whose physical appearances were so similar in minute detail that peculiar identifying features cannot be considered in identification. *Honaker v. State,* 252 Ark. 975, 482 S.W. 2d 111. Voice identification is a part of the same procedure. In any event, the determination is based upon the totality of the circumstances. In that light, we cannot say, when we consider the description given the officers by Mrs. Slinkerd and her opportunity to observe the person in the store, that her in-court identification was tainted.

We are aware that there were many other objections during the course of the trial. None of them warrant any discussion because they are either without merit or harmless.

As previously indicated, the judgment shall be modified unless the Attorney General requests, within 17 days, that the case be remanded for a new trial.

GEORGE ROSE SMITH, HOLT and HICKMAN, JJ., concur in the result but adhere to the views expressed in their dissenting opinions in *Collins* v. *State,* 261 Ark. 195, 548 S.W. 2d 106 (1977).